BARTOLOMÉ FIOL GOMILA, demandante y apelante, *v.* LEANDRO LÓPEZ DE LA ROSA y SIMÓN AXTMAYER, demandados y apelados; y J. A. LÓPEZ ANTONGIORGI, interventor y apelado.

No. 6140.—*Sometido:* Diciembre 14, 1933. *Resuelto:* Mayo 29, 1934.

750

*H. Torres Solá,* abogado del apelante; *C. Iriarte* y *F. Fernández Cuyar,* abogados de los demandados y apelados; *H. R. Francis,* abogado del interventor y apelado.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

En primero de julio de 1930 Bartolomé Fiol y Gomila solicitó de la Corte de Distrito de San Juan la expedición de un auto de *injunction* contra Leandro López de la Rosa y Simón Axtmayer para que por sí y por conducto de sus empleados y subalternos se abstuviesen "para siempre de usar para clínica o para otros fines no residenciales las casas señaladas con los Nos. 1 de la Avenida Olimpo y 4 de la calle Palma, las que actualmente ocupa la Clínica Miramar del Sr. Leandro López de la Rosa."

Se alegó en la demanda que el demandante es dueño del solar y casa No. 2 de la calle Palma, de Miramar, Santurce; que el demandado Axtmayer es dueño del solar y casa No. 1 de la calle Olimpo, de Miramar, Santurce, que linda por su fondo con el del demandante, y que el demandado López de la Rosa tiene instalada una clínica u hospital dedicado al negocio lucrativo de atención de enfermos en la casa del demandado Axtmayer y en otra casa que se levanta en otro solar contiguo al del demandante, marcado con el No. 4 de la calle Palma, que pertenece a José A. López Antongiorgi.

Los referidos solares fueron vendidos originalmente por la Asociación Popular Cooperativa de Construcciones, Ahorros y Préstamos, con la siguiente restricción que se hizo constar en el Registro de la Propiedad:

"Estos solares no se destinarán a establecimientos mercantiles o industriales, sino precisamente a construcciones de casas para habitación."

Se alegó además que a pesar de conocer los demandados la restricción apuntada, el demandado Leandro López de la Rosa, contra la voluntad del demandante, viene usando y usa en la actualidad los reseñados edificios como arrendatario de Simón Axtmayer y de José A. López Antongiorgi, dedicándolos a alojar enfermos como hospital, mediante lucro, y para otros fines no residenciales. Se alegó por último que el demandante, debido a la instalación de dicha clínica u hospital en el expresado sitio, sufre daños graves e irreparables, porque no puede arrendar su casa a causa de los ruidos, malos olores y otras inconveniencias inherentes al funcionamiento de un hospital, que constituyen un estorbo y un peligro para el demandante.

En el pleito intervino el dueño del solar y casa No. 4 de la calle Palma, López Antongiorgi, contestando finalmente la demanda los demandados y el interventor, negando ciertos hechos y alegando defensas especiales que pueden resumirse así: que la casa del demandante, siendo suya, fué arrendada a la Sra. Amelia Dávila de Mock, para que dicha señora instalara en ella la Clínica Miramar y que continuó instalada en dicha casa por un período mayor de dos años; que el demandado López de la Rosa adquirió dicha clínica del Dr. Biascochea en 1927 por precio de veinte mil dólares, gastando luego crecidas sumas en ella, bajo la creencia de que no existía oposición por parte de persona alguna ni menos del demandante, ya que dicha clínica venía funcionando públicamente desde que fué establecida en 1914 por la Sra. Mock, y estuvo instalada en parte, como se ha dicho, en la propia casa del demandante. Durante la vista de la causa el deman-

dante con permiso de la corte presentó una demanda enmendada para ajustar las alegaciones a la prueba. Se introdujeron dos enmiendas: una haciendo constar que el interventor José A. López Antongiorgi es dueño de la casa marcada con el No. 4 de la calle Palma, la que tiene arrendada al demandado Leandro López de la Rosa, y la otra eliminando del título la palabra *"injunction"* y sustituyéndola por las de "cumplimiento de condición restrictiva." En la súplica se eliminaron también las palabras "auto de *injunction."*

La demanda fué declarada sin lugar. Apeló el demandante de la sentencia, atribuyendo a la corte inferior varios errores que consideraremos en tanto en cuanto afectan a las cuestiones fundamentales ventiladas en este litigio.

■ No hay duda alguna acerca de la existencia de la restricción invocada. Tampoco hay duda de que esta restricción debe hacerse cumplir cuando el derecho del demandante surge de las alegaciones y la prueba. Dos casos han sido ya resueltos por esta Corte Suprema en relación con los solares de la misma urbanización donde están enclavados la clínica y el solar del demandante, a saber: *Glines* v. *Matta,* 19 D.P.R. 409, y *Macatee* v. *Biascochea,* 37 D.P.R. 1.

En el primero de dichos casos se decidió que puede acudirse al procedimiento de *injunction* para impedir la violación de las restricciones impuestas a los dueños de solares procedentes de una finca que ha sido urbanizada y que está sujeta a las referidas restricciones. En el resumen de este caso se dice que:

"Cuando una asociación cooperativa de construcción acuerda ciertas restricciones con respecto a la construcción de edificios, en una finca que ha de ser dividida en solares y se hace constar dichas restricciones en la inscripción de la totalidad de la finca en el registro de la propiedad y se mencionan esas restricciones en las subsiguientes escrituras, todos los que posteriormente compran solares están obligados a respetarlas, aun cuando en el traspaso a ellos no contraten específicamente acerca de dichas restricciones.

"Los dueños de solares procedentes de una finca que ha sido urbanizada afecta toda ella a ciertas restricciones en la construcción de

casas que constan en la inscripción de dicha finca en el registro de la propiedad, pueden ejercitar la acción de *injunction* para impedir que algunos dueños infrinjan dichas restricciones.''

En *Macatee* v. *Biascochea,* supra, esta corte sostuvo que .''la restricción de no levantar edificación alguna que no sea para fines residenciales impuesta sobre determinados terrenos queda violada al usarse un edificio levantado en dichos terrenos, como hospital.''

Sostiene en su alegato el apelante que la restricción de que se trata constituye una servidumbre negativa tal como se define en el artículo 540 del Código Civil, e invoca lo dicho por esta Corte Suprema en el citado caso de *Glines,* supra, y en el de *Lawton* v. *Rodríguez,* 35 D.P.R. 487. En el primero de dichos casos la corte se expresó así:

''Lo que en realidad alegan los apelantes es una infracción de sus derechos y la fundan en la posesión que tienen de una parcela de terreno. Alegan derechos que si no expresan claramente los de un gravamen o servidumbre, es algo equivalente a esto. Sostienen que tienen derecho a dejar libre tres metros de espacio de las edificaciones en la parte de Miramar, donde tienen su residencia. Opinamos que discuten un derecho real con arreglo a la letra y espíritu del artículo 75; y si una de sus principales alegaciones es correcta, el derecho que alegan tener se refiere a la propiedad más bien que a la persona. Tal fué la cuestion suscitada entre las partes, y los apelados tenían derecho a que la misma fuera resuelta en San Juan.''

En el de *Lawton* v. *Rodríguez* esta corte dijo:

''La contención más importante del apelante en contra de la sentencia apelada que declaró con lugar la demanda, es la que sostiene, en resumen, que se trata de una restricción de carácter personal entre vendedor y comprador, que no obliga a futuros compradores para hacerse efectiva por ellos entre sí y que tales restricciones no son las servidumbres que reconoce el Código Civil para lo cual siempre debe existir un predio dominante y un predio sirviente.

A nuestro juicio la legislatura al adoptar el Código Civil antiguo en materia de servidumbres, sin introducir ninguna modificación o innovación en las mismas, no fué porque no se pudiera prever la nueva modalidad que representa las restricciones cuyo carácter se discute y que exigencias de urbanizaciones más modernas parecen imponer

por razones de orden sanitario y de ornato o embellecimiento, sino porque el concepto de las servidumbres positivas y negativas que define el Código es tan amplio que a poco que se analicen tales restricciones no parece que sean extrañas por su naturaleza a las negativas de las que el Código en su artículo 540 prescribe como sigue:

"'Art. 540.—Las servidumbres son además positivas o negativas.'

"'Se llama positiva la servidumbre que impone al dueño del predio sirviente la obligación de dejar hacer alguna cosa o de hacerla por sí mismo, y negativa la que prohibe al dueño del predio sirviente hacer algo que le sería lícito sin la servidumbre.'

"Dentro del tecnicismo legal, si la servidumbre consiste en dejar hacer algo el dueño del predio sirviente (servidumbre positiva), o en prohibir a éste hacer algo que le sería lícito sin la servidumbre (servidumbre negativa), parecería lógico afirmar que las restricciones que obligan recíprocamente a cada dueño de solar, por razón de ser propietarios, de sólo fabricar una casa en cada solar, participan en su esencia por la prohibición de un uso específico de la cosa ajena, de aquellas servidumbres que consisten en no lovantar más alto un edificio, *servitas non altius tollendi*, y que procedentes del derecho romano habían sido harto conocidas hasta ahora.''

Creemos que en verdad se trata de algo parecido a una servidumbre, pero es lo cierto que ese algo, si bien tiene raíces muy hondas en el derecho histórico, por vez primera surgió en toda su integridad y tal como se presenta en este caso al iniciarse en esta Isla las llamadas urbanizaciones a virtud de las cuales lotes de terreno de mayor o menor extensión se dedican a la construcción de edificios incluyendo calles, aceras, alcantarillado, acueducto y alumbrado, total o parcialmente, según reglas previamente establecidas, debiendo en tal virtud interpretarse esas reglas de acuerdo con los principios de derecho a la luz de los cuales se han venido interpretando en los estados de su origen, siempre desde luego que no estén esos principios en conflicto con las leyes en vigor en Puerto Rico.

En los propios casos que invoca el apelante, la corte en el primero dijo, por voz de su Juez Asociado Sr. Wolf, que se trataba de algo *equivalente a un gravamen o servidumbre* y en el segundo por voz de su Juez Asociado Sr. Franco de

algo que *participaba en su esencia de la naturaleza de determinadas servidumbres,* pero para la resolución de ambos casos se aplicaron principios de equidad, de acuerdo con la jurisprudencia establecida por las cortes americanas sobre el particular.

De la Enciclopedia Angloamericana, tomo quinto, páginas 4 y 5, copiamos lo siguiente:

"Los derechos creados por cláusulas y pactos restrictivos son calificados frecuentemente de servidumbres; y si bien la forma de constituir estos derechos y los límites dentro de los cuales las cortes de equidad los hacen cumplir difieren de las servidumbres corrientes, sin embargo el hecho de que las cortes los pongan en vigor en forma negativa, y exijan, a fin de adherirlas al suelo, que ellas sean impuestas en beneficio de otros terrenos vecinos, exigiendo en síntesis un predio sirviente y un predio dominante, les hace tener íntima analogía con las verdaderas servidumbres. Tampoco el hecho de que se creen por pacto equivale a una negación de tal naturaleza, pues una servidumbre puede ser constituída mediante convenio expreso o por concesión, y no es necesario que los derechos se constituyan en el momento en que se enajena el predio dominante o el predio sirviente. Se ha negado, sin embargo, que estos derechos puedan considerarse satisfactoriamente como servidumbres y las cortes de equidad por lo general hablan de ellos como servidumbres negativas o de equidad, o simplemente de equidades o aquiescencias."

El demandante eliminó la palabra *injunction* del título y de la súplica de la demanda. A pesar de que un cambio de título no altera la naturaleza de la causa de acción, la verdad es que tanto en la demanda original como en la demanda enmendada se solicita el cumplimiento de una condición restrictiva, y precisamente son estas restricciones las que de acuerdo con la jurisprudencia americana se regulan por los principios de equidad.

La prueba demuestra que la Clínica Miramar desde que fué establecida ha funcionado de una manera pública y notoria y que el demandado López de la Rosa, después de instalada esta clínica y de funcionar sin interrupción por unos diez años, adquirió la misma, invirtiendo una suma conside-

rable de dinero. El conocimiento que tuvo el demandante de la existencia de esta clínica es cosa que no admite duda.

Examinemos ahora la prueba aportada en tanto en cuanto se relaciona con la conducta del propio demandante para ver si éste tiene derecho o no a obtener en la actualidad el remedio que solicita.

Inicia su testimonio el demandante diciendo que en cuanto empezó la obra hace un año y comprendió que no podría fabricar allí una casa de cuatro pisos estando la clínica al lado y estando fuera de la ley, se decidió a solicitar un *injunction*. Con la clínica al lado le sería algo difícil alquilar la casa. Antes, la clínica no le perjudicaba porque era una casa que vivían los "Elks", pero cuando empezó a construir su edificio notó que era un perjuicio muy grande la clínica. Habla entonces el demandante de los malos olores de las medicinas y las comidas, de los algodones que se arrojan en el patio, de los trajes de los enfermos y de sus quejidos, y de la salida de los cadáveres. Por estas razones la clínica dificultaba el alquiler de la casa.

Así comienza su testimonio el demandante. De sus palabras se deduce que a pesar de que la violación de la condición restrictiva databa de muchos años, no había realizado gestión alguna para evitar que continuase violándose, porque hasta la fecha en que comenzó ·a construir su edificio no le había perjudicado. Conviene hacer constar que la acción ejercitada no se basa en un estorbo público o privado que el demandante quiere eliminar, sino en una obligación surgida de un contrato que se impuso originalmente al venderse los solares por la Asociación Popular Cooperativa de Construcciones, Ahorros y Préstamos. Hacemos esta aclaración únicamente con el propósito de mantener la pureza del procedimiento, porque la verdad es que la prueba aportada no demuestra que el funcionamiento del hospital constituya en la actualidad un estorbo o *nuisance*.

El testigo declara que en el año 1913 se trasladó a Santo Domingo. Cuando se le pregunta por primera vez cuántas

veces vino a Puerto Rico desde esa fecha, responde que vino una durante siete años que estuvo allí. Esta manifestación la repite diciendo que desde el año 1913 en que se fué, hasta el 1920 ó 1921 que estuvo en Santo Domingo, sólo vino una vez. Afirma el testigo que la primera vez que vino a Puerto Rico le dijo Cipriano Santos, que corría con la casa, que la había alquilado al Dr. López Antongiorgi y más tarde dice que Cipriano no le habló del Dr. López Antongiorgi, que le dijo que había alquilado la casa a un doctor para una clínica y que le hizo saber que no podía alquilarla para clínica, contestándole Cipriano. ''Yo la alquilé.'' Esto ocurre, según el propio testigo, en el año 1915 ó 1916, diciendo nuevamente que vino de Santo Domingo una sola vez. Luego declara que Cipriano le dijo que había alquilado la casa a un doctor, sin manifestarle que fuera para clínica, y que él vió la clínica después. Se le recuerda por el demandado lo que había declarado hace un momento y entonces dice que Cipriano le dijo que había alquilado la casa para clínica, contestándole que no podía alquilarla para clínica. Estas manifestaciones las hace el demandante en su primer testimonio cuando se practicaba su prueba. Más adelante hablaremos de su declaración cuando compareció nuevamente ante la corte para rebatir la prueba del demandado.

La Sra. Amelia Dávila de Mock, que en 1914 estableció la Clínica Miramar, tomando en arrendamiento la casa del Sr. Fiol, declara que habló por primera vez de la casa con don Bartolomé y le dijo que la interesaba: que después se entendió con ella un apoderado que tenía que se llamaba don Cipriano, a quien le dijo que necesitaba la casa para poner una clínica. Manifiesta la testigo que únicamente le dijo a Fiol que si le alquilaba la casa, y que para el arrendamiento se entendió con Cipriano Santos; que después de establecida la clínica vió al Sr. Fiol muchas veces y recuerda haber hablado con él allí para el arreglo de unos pozos muros que había debajo de la casa y varias veces más; que el Sr. Fiol era casado y vió a su esposa un día que la llevó a la clínica

para curarse una erupción en la piel; que el Sr. Fiol acompañaba a su esposa cuando fué a la clínica; que habló con el Sr. Fiol en el año que le tomó la casa, que fué en 1914, y que cuando habló con él estaba en Puerto Rico; que el Sr. Fiol salía con frecuencia; que muchas veces le preguntaba a don Cipriano y éste le decía que estaba en Santo Domingo; que le pagada las rentas de la casa a don Cipriano.

El Dr. López Antongiorgi declara que la clínica Miramar se instaló en la casa propiedad de los esposos Fiol, allá para el año de 1914; que esta clínica perteneció durante los dos primeros años a la Sra. Mock y después al testigo, que la compró cuando construyó una casa al lado; que la casa del Sr. Fiol y la de él constituían la Clínica Miramar, unidas por un puente arriba y abajo: que cuando la Sra. Mock le entregó la clínica habló con el Sr. Fiol y convinieron un precio algo superior al que le pagaba dicha señora para seguir con la casa y que el Sr. Fiol aceptó también que se le pusiera el puente y por dos o tres años tuvo la casa en comunicación con su edificio para la Clínica Miramar; que ese puente es una continuación de la casa del Sr. Fiol hasta el balcón de la casa del testigo para que se comunicaran ambas; y que ambas formaban la Clínica Miramar; que en esas condiciones continuó hasta 1916 ó 1917 y que en ese período de tiempo trató con el Sr. Fiol el canon de arrendamiento; que en otra ocasión, cuando se hundieron los pisos de una de las habitaciones grandes de la casa, siendo el testigo miembro de la Junta Superior de Sanidad, hizo venir un inspector, quien le comunicó que la casa ofrecía peligro y que debía ser reparada; que con ese motivo se comunicó con el Sr. Fiol, quien vino la misma mañana a la casa y arregló los pisos.

El testigo Vicente del Valle declara que vió varias veces en la clínica al Sr. Fiol allá por los años 1915 y 1916, que Fiol residía en Santo Domingo y venía a Puerto Rico; que no sabe cuántas veces vino, pero que lo vió varias veces allí.

También declara el Dr. Manuel Díaz García, que recuerda

haber visto al Sr. Fiol en la Clínica Miramar allá por el año 1916.

La prueba de la parte demandada tiende a demostrar que el Sr. Fiol tenía conocimiento del establecimiento de la clínica en su propia casa, la cual fué alquilada por su apoderado Cipriano Santos. Para rebatir esta prueba declaró de nuevo el demandante.

Declara el testigo que se trasladó a Santo Domingo para establecer una fábrica de mosaicos que funcionó hasta el año 1922, en que regresó a Puerto Rico; que desde Santo Domingo fué directamente a España, donde se enamoró y se casó con la Sra. Corona Cortés; que allí se otorgaron las capitulaciones matrimoniales en 13 de junio de 1914, tres días antes de casarse en Barcelona; que después de casado vivió cuatro meses en España y de allí embarcó para Santo Domingo, donde llegó treinta días después; que el barco tocó en Cádiz, Valencia y Puerto Rico; que en el año 1916 vino a Puerto Rico en una goleta y luego volvió en 1920; que su esposa vivió dos años en España, dos años en Puerto Rico y el resto en Santo Domingo; que el testigo regresó de Santo Domingo en el año 1922, y que su esposa murió aquí en San Juan en el 1923; que antes del 15 de julio de 1914 en que fué arrendada a la Sra. Mock la casa que existía en el solar del demandante, estaba en Santo Domingo; que oyó cuando la Sra. Mock declaró que el testigo había estado presente en cierta reunión que se celebró en dicha casa entonces alquilada y que para esa fecha se encontraba en Santo Domingo; que no conoce a la Sra. Mock ni a los Dres. López Antongiorgi y Díaz García; que no conoce al Dr. Díaz García; que no ha tenido negocios con él; que lo conoce actualmente porque ha comprado mosaicos en su casa. A preguntas del abogado del demandado contesta que salió de Santo Domingo para España en el año 1914, como el 25 de febrero; que regresó solo a Santo Domingo y que su esposa quedó en España hasta dos años después; que continuó en Santo Domingo hasta el año 1916 en que vino a Puerto Rico en una

goleta; que estuvo en Puerto Rico antes de que regresara su señora en el mismo año y que no vino a verla cuando regresó; que su esposa se trasladó a Santo Domingo donde permaneció dos años y luego regresó a San Juan y vivió en una de sus casas en la calle Américo Salas; que estuvo cuatro años sin ver a su esposa; que vino a Puerto Rico. en el año 1920 y que permaneció aquí dos días; que desde el año 1922 se ha quedado aquí y no ha ido a España ni a Santo Domingo.

Antes de finalizar el testimonio del testigo la corte se declaró en receso hasta el siguiente día. Al reanudar el tribunal sus sesiones, el abogado del demandante manifestó que en vista de la moción de la parte demandada solicitando la comparecencia de un empleado de la oficina de Inmigración con ciertos documentos, el demandante, haciendo memoria, había recordado otros viajes y deseaba amplificar su examen directo antes de ser repreguntado en conjunto sobre todo el tiempo que estuvo ausente de Puerto Rico. Se le preguntó al testigo si además de su viaje a España cuando se casó hizo algún otro viaje con su esposa y contestó que ayer no se recordaba, porque no sabe leer y escribir, que apenas si sabe firmar, que se acordó anoche que salió de San Juan para España con su esposa y que otorgaron ambos una escritura ante notario en Mahón de Menorca en 22 de febrero de 1916 y que a su regreso embarcaron en Barcelona y desembarcaron en Puerto Rico; que recuerda haber hecho un viaje con su esposa a Santiago de Cuba, saliendo de Puerto Rico, adonde regresaron con una compañía de zarzuelas que se llamaba Compañía Corona; que su esposa vino de Santo Domingo al Auxilio Mutuo allá por los años 1919 ó 1920; y que vino una vez a verla mientras estaba en el referido asilo; que no lleva nota de sus viajes y que no tiene conocimientos ni instrucción.

A preguntas del abogado de la parte demandada contesta que le parece que hizo un viaje a Puerto Rico en 1914 en el vapor Legazpi; que le parece que desembarcó en Puerto Rico cuando vino de Barcelona a Santo Domingo; que en el año 1916 vino a Puerto Rico; que hizo dos viajes a Puerto Rico

en el año 1916, uno en el vapor Jacaguas y otro en una goleta; que vino a Puerto Rico procedente de Barcelona en el año 1916 en el vapor Buenos Aires y que hizo tres viajes en ese año; que también vino a este país en el año 1919 y en el año 1920.

Es muy difícil seguir al testigo en su testimonio, que, aparte de ser extenso, resulta confuso y redundante, porque se repiten las preguntas y las contestaciones, y el demandante niega lo que antes aceptara o acepta lo que negara, incurriendo en frecuentes contradicciones. Bajo la presión del contrainterrogatorio el Sr. Fiol admite que hizo varios viajes a Puerto Rico, aun cuando, al comparecer por primera vez como testigo, afirmó en repetidas ocasiones que desde el año 1913 al 1920 vino una sola vez a este país.

El Sr. A. R. Bennett, Comisionado Auxiliar de Inmigración de Puerto Rico, hace una relación de los viajes de Fiol a Puerto Rico y desde Puerto Rico. Declara este testigo que en julio 29, 1914, el Sr. Fiol llegó a San Juan en el vapor Legazpi procedente de Barcelona; que en septiembre 19, 1915, desembarcó en este puerto en el vapor Cuba, procedente de la Habana; que en 17 de enero de 1916 arribó a San Juan en el vapor Jacaguas procedente de la República Dominicana; que en 29 de abril del mismo año llegó a este puerto en el vapor Buenos Aires procedente de Barcelona, España; que en 29 de enero de 1919 llegó a San Juan procedente de Santo Domingo en el vapor Santo Domingo; que en abril, 1920, arribó a San Juan en el vapor Marina procedente de Santo Domingo; que en 9 de noviembre del mismo año y en el mismo vapor, desembarcó también en este puerto procedente de Santo Domingo, y que en 10 de febrero de 1922 llegó a San Juan en el vapor Marina procedente de la misma república.

En 23 de noviembre de 1914 el Sr. Fiol aparece otorgando una escritura en San Juan, ante el notario Francisco Ramírez de Arellano, en su representación y como apoderado de su esposa doña Raimunda Andrés Miguel, residente entonces en España. El Sr. Fiol comparece nuevamente y declara que

vino con esta señora una vez a Puerto Rico y como no podía desembarcar dijo que era su esposa, que no tuvo que prestar juramento alguno ni firmó ningún documento; que manifestó ante el Sr. Monserrat que era su esposa por no hacerle un desprecio a aquella señora después de haber dicho a todo el mundo que era su marido. Según surge de la misma escritura, cuando don Bartolomé Fiol declaró ante notario que esta señora era su esposa, por no despreciarla, la misma estaba residiendo en España.

La prueba demuestra que el Sr. Fiol salía de Puerto Rico y volvía con bastante frecuencia. Desde 1913 a 1920 el demandante estuvo en Puerto Rico siete veces, amén de su último viaje en 1922 para residir permanentemente en la isla. Bien pudieron verlo en la clínica los testigos que declararon que había estado en distintas ocasiones allí; pero, aún descartando el testimonio de estos testigos, se hace duro creer que este señor, que tenía alquilada su casa, no se ocupara de averiguar a quién había sido alquilada y a qué se destinaba. El propio demandante expresa que Cipriano Santos le dijo que había alquilado la casa a un doctor para una clínica cuando vino por primera vez a Puerto Rico, y se ha probado que desde 1914 los viajes de ida y vuelta de dicho demandante se sucedieron con frecuencia. ¿Hizo algo el Sr. Fiol para adquirir una información más amplia, asumiendo que fuera necesaria, e impedir que se siguiese utilizando la casa para clínica? No aparece que el demandante practicase ninguna gestión en ese sentido. La casa fué luego arrendada a otras personas. La clínica continuó funcionando, y el Sr. Fiol, que tenía conocimiento de su existencia, dejó transcurrir el tiempo pasivamente hasta 1930 en que promovió esta acción, diez y seis años después de instalada la referida clínica.

De acuerdo con los principios de equidad no debe prestarse atención a quien pide ser relevado de las consecuencias de su propia negligencia o de la negligencia de su mandatario. *Miller* v. *Barto*, 247 Ill. 104, 93 N. E. 140; 21 Corpus Juris 251. Es un principio firmemente establecido por los

tribunales que cuando una cuestión de *laches* está en controversia, se imputa al demandante aquel conocimiento que haya podido obtener mediante investigación, con tal de que los hechos ya conocidos por él sean de tal naturaleza que hagan recaer sobre una persona de inteligencia ordinaria el deber de inquirir. *Johnston* v. *Standard Mining Co.,* 148 U. S. 370.

La defensa de que la persona acusada de inactividad (*laches*) carece de conocimiento, es fácil de probar y muy difícil de rebatir, y de ahí la tendencia de los tribunales a exigir razonable diligencia para adquirir la debida información. *Foster* v. *Mansfield etc. Railway,* 146 U. S. 88.

Hay que tener en cuenta que el demandante confiesa que desde 1922 ha vivido constantemente entre nosotros. Desde esta fecha hasta 1930 han transcurrido ocho años, sin que se haya probado que el Sr. Fiol·haya dado ningún paso ni realizado ninguna gestión, ni llamado la atención a los demandados para evitar que se siguiese violando la restricción.

En el caso de *Loud* v. *Pendergast,* 92 N. E. 41, se inició una acción para evitar la violación de una condición restrictiva incluída en un plan general para el beneficio común, requiriendo que todos los edificios estarían por lo menos a una distancia de diez pies de la calle. Una pequeña parte de la casa del demandado quedó situada dentro del área sujeta a la restricción. El demandante violó también la restricción, adelantándose algunas pulgadas en el terreno prohibido, con ventanas que se proyectaban sobre el mismo, como a una distancia de tres pies. La Corte Suprema de Massachusetts, al resolver este caso en apelación, se expresó así:

"Se sostiene que la demandante no tiene derecho al remedio solicitado, toda vez que ella ha incurrido en una falta, ya que ha violado las mismas restricciones en tal forma que no acude a la corte con manos limpias y en vista de que el plan original ha sido violado en tal forma en el vecindario que hace imposible poner en vigor la restricción contra este demandado.

"En casos de esta naturaleza las cortes de equidad conceden remedio tan sólo cuando éste se solicita con prontitud y cuando en todo momento se ha desplegado activa diligencia en relación con el asunto

en controversia. La conciencia exige que uno no permanezca en silencio mientras otra persona de buena fe y bajo un supuesto derecho incurre en gastos considerables, para entonces acudir a una corte a hacer cumplir ciertas restricciones con grave perjuicio, y cuando un aviso oportuno u otro proceder adecuado hubiese evitado el daño de que se queja el demandante. Stewart v. Finkelstone, 92 N.E. 37, y casos citados.

"Cuando un demandante ha infringido la misma restricción que trata de hacer cumplir, sustancialmente hasta el mismo límite y en la misma forma general que lo ha hecho la parte demandada, y no existe diferencia material entre una y otra restricción, una corte de equidad ordinariamente no tomará cartas en el asunto. Bacon v. Sandberg, 179 Mass. 396, 60 N.E. 936; Scollard v. Normile, 181 Mass. 412, 63 N.E. 941. Ese demandante no se halla en tal posición que pueda quejarse justificadamente pues no acude a las cortes con manos limpias en relación con el asunto específico en que solicita el remedio, ni ha cumplido con la máxima de que todo aquél que solicita equidad debe haber hecho equidad."

De la obra "High on Injunctions", párrafo 1159, tomamos lo siguiente:

"Al considerar solicitudes de *injunction* contra la violación de condiciones restrictivas contenidas en la trasmisión de propiedad inmueble, las cortes requieren debida diligencia de parte del demandante que solicita el remedio, y pasividad (*laches*) o aquiescencia de su parte en la violación de la condición restrictiva ordinariamente hará fracasar su petición. Ciertamente, la equidad requiere la mayor diligencia en esta clase de casos de parte de aquél que invoca su ayuda preventiva y un pequeño grado de aquiescencia es suficiente para que no prevalezca la solicitud, puesto que cada acto que el demandante consienta al permitir construcciones en violación de lo convenido equivale por tanto a una desautorización de la obligación. Por ende, cuando el demandante deja, por un período de cuatro o cinco meses, que el demandado siga adelante con su edificación en violación de la condición, no podrá obtener remedio mediante *injunction*."

Esta corte, en el caso de *Macatee* v. *Biascochea,* supra, copia el *syllabus* del caso de *Hartwig* v. *Grace Hospital,* 198 Mich. 725, 165 N.W. 827, que dice así:

"Y a los propietarios en un distrito limitado exclusivamente a residencias, que se cruzan de brazos y permiten que se altere un edificio

en distintas épocas, se gasten grandes sumas de dinero, se le quite todo el aspecto de una residencia y se use como un hospital, no se les concederá un *injunction* para impedir su continuación como tal, aunque sí se concederá un *injunction* para impedir la fabricación de nuevos edificios.''

Con respecto a los ''ruidos, malos olores y otros inconvenientes inherentes al funcionamiento de un hospital, que constituyen un estorbo y un peligro para el demandante'', según alega en su demanda, declararon el propio demandante sosteniendo sus alegaciones, y el Dr. López de la Rosa negándolas, y el Sr. A. G. Bishop, secretario tesorero del ''Union Club'', quien vivía al lado de la Clínica Miramar, desde hacía un año en el momento en que produjo su testimonio. Declara este testigo que mientras ha estado en su hogar no ha sido perturbado en su tranquilidad durante la noche o el día por la Clínica Miramar, que no ha sido molestado por olores, que permanece en el club seis, ocho o diez horas durante el día y que durante los doce años que ha estado allí no ha sido molestado por dicha clínica; que entre el ''Union Club'' y la Clínica Miramar hay un terreno triangular, que la parte delantera está como entre tres o cuatro metros de distancia, y la parte de atrás va de mayor a menor; que en el sitio de mayor extensión la clínica y el club están separados por el ancho de un solar ocupado actualmente por una casa que el Sr. Fiol está edificando.

Aún cuando la acción que se ejercita persigue el cumplimiento de una condición restrictiva, la verdad es que no ha quedado probado el estorbo alegado por el demandante, a menos que llegáramos a la conclusión de que un hospital es un estorbo *per se*.

En cuanto a la imposición de costas, entendemos que dada la prueba practicada y la conducta observada por el demandante, la discreción judicial de la corte inferior ha sido bien ejercitada y que *debe confirmarse en su totalidad la sentencia apelada*.

El Juez Presidente Señor Del Toro no intervino en la decisión de este caso.