El Juez Asociado Sr. Serrano Geyls no intervino.

ROBERTO COLÓN PADILLA y ANA MARÍA ROMÉU DE COLÓN, demandantes y recurrentes, *v.* SAN PATRICIO CORPORATION, ET AL., demandados y recurridos.

Número 11233.
*Sometido:* 2 de mayo de 1955.* *Resuelto:* 14 de abril de 1959.

* Reasignado: 30 enero de 1958.

*Toro & Malley*, abogados de los recurrentes; *Fiddler, González & Nido* y *Carlos J. Faure; Milton F. Rúa; Miranda Esteve & Martínez Álvarez, Jr.*, y *A. Miranda Cárdenas; Otero Suro & Otero Suro*, abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR SALDAÑA emitió la opinión del Tribunal.

Ante el Tribunal Superior, Sala de Bayamón, Roberto Colón Padilla y Ana María Roméu de Colón formularon una demanda intitulada "Sobre modificación de restricciones" contra la San Patricio Corporation, el Registrador de la Propiedad de Bayamón y otros. Allí alegaron, en síntesis, que el 14 de diciembre de 1942 ellos adquirieron por compra de H. L. Sewall una finca de un área aproximada de 100.25 cuerdas; que la misma era el remanente de otra finca de mayor cabida, de la cual anteriormente se habían segregado y vendido 76 y pico de cuerdas a la San Patricio Corporation; que en la escritura de venta a esa corporación figura una serie de "restricciones y limitaciones" impuestas ". . . con el fin de establecer un plano uniforme de mejoras a beneficio de los presentes y futuros adquirentes de la finca aquí vendida, o cualquier parte de la finca principal que en el futuro se dividiere para fines residenciales . . ."; que, de acuerdo con los términos de la aludida escritura, dichas restricciones ". . . gravarán todo el terreno objeto de esta compraventa y cualquier

parte de la finca principal de la cual se segrega la misma que en el futuro fuere subdividida para dedicarla a fines residenciales . . .", por lo cual las mismas en efecto constituyen un gravamen tanto sobre la finca vendida a la San Patricio Corporation como sobre el remanente de la finca principal que los demandantes adquirieron posteriormente; que una de esas restricciones impide subdividir cualquiera de las fincas para fines residenciales *"en parcelas menores de un acre"*, y otra dispone que no podrá edificarse *"a menos de 50 pies del frente del solar o parcela y a no menos de 25 pies de los límites laterales del solar o parcela"*; y que de hecho la antigua Corte de Distrito de Bayamón, con fecha 16 de agosto de 1951, dictó sentencia resolviendo que la finca propiedad de los demandantes se halla afecta y sujeta a cada una de las referidas restricciones.

Además, invocando ". . . la jurisdicción en equidad [del] Tribunal, toda vez que las restricciones . . . constituyen servidumbres en equidad, siendo ésta una materia regulada por principios de equidad . . .", los demandantes solicitaron la cancelación, modificación o alteración de dichas restricciones con miras a permitir la construcción en su finca de una urbanización con solares de mil metros (en vez de solares de un acre) que no estén sujetos a las limitaciones relativas a patios delanteros y laterales. Para ello adujeron los siguientes fundamentos que es imprescindible copiar aquí a la letra:

"A. Las restricciones sobre la propiedad no deben favorecerse, y los tribunales no deben dar cumplimiento a las mismas cuando sean contrarias al orden público o cuando produzcan una injusticia (*Glines* v. *Matta*, 19 D.P.R. 409).

"B. La Junta de Planificación, Lotificación y Zonificación, el organismo creado por ley para regular las construcciones y urbanizaciones en Puerto Rico, ha autorizado una urbanización en la propiedad de referencia a base de solares de alrededor de mil metros, siendo por tanto las mencionadas restricciones contrarias al orden público.

"C. Entre 31 de agosto de 1940, fecha de creación de las referidas restricciones, y el presente, han ocurrido cambios radicales

en la vecindad de la Urbanización San Patricio y de la propiedad de los demandantes con motivo de la ampliación de la Carretera Insular núm. 2, construcción de la Avenida Roosevelt, y desarrollo de las Urbanizaciones Caparra, Caparra Terrace, Caparra Heights, Puerto Nuevo y Park Side, algunas de las cuales colindan con la Urbanización San Patricio y con la propiedad de los demandantes.

"D. La ciudad de San Juan ha extendido sus límites hasta la misma colindancia de la finca propiedad de los demandantes.

"E. Con motivo de los anteriores cambios en la vecindad, la propiedad de los demandantes ha tenido tal incremento en valor para todos los efectos, incluyendo contribuciones sobre la propiedad, que dedicarla hoy por necesidad a fines agrícolas produciría una seria injusticia e iniquidad.

"F. Los demandantes están imposibilitados de urbanizar su propiedad para vender solares no menores de *un acre*, toda vez que el costo de urbanizar asciende hoy día a $3 por metro cuadrado, comparado con $0.30 en 1940 cuando se crearon las restricciones aquí envueltas, por lo cual el costo de urbanizar ascendería a alrededor de $12,000 por solar, a la cual suma habría que añadir costo de la propiedad y otros gastos, tales como honorarios, comisiones, reserva para pago de contribución sobre ingresos, y por ciento de beneficios, resultando de todo lo anterior que el precio de la venta de un solar no menor de un acre ascendería a alrededor de $18,000; no habiendo mercado para la venta de solares en tal región a razón de $18,000 por solar.

"G. Con motivo de los cambios radicales ocurridos en la vecindad y del desarrollo general de la ciudad de San Juan y sus alrededores, los objetos y propósitos de dichas restricciones han sido completamente y permanentemente destruídos.

"H. Con motivo igualmente de los cambios radicales ocurridos en la vecindad, enforzar las restricciones de referencia no serviría de ningún beneficio sustancial a cualquier parte que así lo solicitara.

"I. Siendo perpetuas las servidumbres en equidad, su continuación a perpetuidad resultaría de enorme perjuicio a los demandantes, con motivo de los cambios ocurridos en la vecindad, produciendo así tales restricciones una seria injusticia en cuanto a los demandantes.

"J. La construcción de una urbanización de primera categoría bajo los reglamentos y disposiciones de la Junta de Planificación,

Lotificación y Zonificación, a base de solares de mil metros, no afecta hoy día los objetos y propósitos de las referidas restricciones."

A instancia de los demandados, que en su contestación o por moción alegaron que la demanda "no exponía hechos constitutivos de causa de acción", y sin celebrar vista para considerar el caso en sus méritos, el Tribunal Superior dictó sentencia final en el pleito declarando sin lugar la demanda e imponiendo $500 de honorarios de abogado a los demandantes. Para fundamentar su fallo el Tribunal Superior se expresó así:

"La demanda en este caso se titula Modificación de Restricciones. A virtud de ella se intenta variar los términos de un contrato consignado por escritura pública y en cuyos términos consintió el propio demandante.

"Esta misma Sala del Tribunal Superior se negó a hacer lo que ahora pretende el demandante. Nos referimos a la sentencia que dictáramos el día 16 de agosto de 1951, la cual es firme por no haberla apelado Roberto Colón en el caso titulado Civil Núm. R-4321, Roberto Colón v. Frank Ramírez de Arellano, sobre Sentencia Declaratoria.

"En este litigio el demandante invoca el principio de equidad aparentemente fundándose en el art. 7 del Código Civil, Edición 1911. Los actos jurídicos, generadores de derechos y obligaciones, tienen el nombre, la significación y el alcance que les da la ley, debidamente apreciados, no el que quieren darle las partes. Los contratos, para los que en ellos intervienen, ofrecen tanta fuerza como la misma ley.

"En el caso presente Roberto Colón intervino en contratos en virtud de los cuales se obligó y ahora no puede invocando la equidad, desvincularse de tales obligaciones. No es lícito a las partes negar derechos que anteriormente hayan reconocido. Es principio de derecho el que establece que 'PACTA SUNT SERVANDA', regla jurídica expresiva de que lo pactado debe guardarse, y determina que lo estipulado por las partes debe ser fielmente guardado y cumplido. El contrato es ley para los contratantes y es doctrina legal que los contratos no pueden dejarse sin efecto por la voluntad de uno solo de los contratantes y que nadie puede ir contra sus propios actos. De cualquier manera que uno se

obligue queda obligado y no se puede alterar la forma en que una servidumbre se constituye a voluntad de una de las partes.

"Entendemos que tienen razón los demandados al alegar que la demanda no aduce hechos para constituir una causa de acción. Entendemos, además, que la demanda no es enmendable.

"Se declara sin lugar la demanda interpuesta en este caso por Roberto Colón Padilla y se le condena en costas, incluyendo la suma de quinientos dólares ($500.00) para los abogados de la parte demandada."

Se solicitó la reconsideración alegando que no procedía desestimar el pleito sin vista porque la demanda aducía una causa de acción suficiente en derecho y además hacía falta prueba para resolver el punto de *res judicata*. El tribunal de instancia, luego de oir a las partes sobre la moción de reconsideración, resolvió que ésta no tenía méritos y la declaró sin lugar. Entonces los demandantes apelaron. Y ante nos consignan los siguientes motivos de revisión:

"Primer Error. El Tribunal [Superior] cometió error al resolver que los demandantes no tenían causa de acción.

"Segundo Error. El Tribunal [Superior] cometió error al aplicar la doctrina de cosa juzgada al caso de autos.

"Tercer Error. El Tribunal [Superior] cometió error al desestimar y dejar de resolver la cuestión de derecho en cuanto a la supremacía de la Junta de Planificación sobre restricciones contractuales.

"Cuarto Error. El Tribunal [Superior] cometió error al imponer la suma de $500 para honorarios de abogado."

## I

■■■ Obviamente las "restricciones, condiciones y limitaciones" respecto al uso de la finca de los demandantes constituyen lo que nuestra jurisprudencia llama *"servidumbres en equidad"*. Se trata en efecto de cláusulas restrictivas "a beneficio de los presentes y futuros adquirentes" que imponen cargas o gravámenes especiales, como parte de un plan general de mejoras para el desarrollo de una urbanización residencial en esa finca y en la parcela que adquirió la San Patricio Corporation. Mediante las susodichas cláusulas, las

partes estipularon restricciones de uso idénticas y uniformes para ambas propiedades. Además las restricciones así impuestas eran razonables, se hicieron constar específicamente en el título y se inscribieron en el registro de la propiedad. Repetidamente hemos resuelto que esas cláusulas restrictivas son válidas y también que crean cargas o gravámenes reales sobre un inmueble a beneficio de otro.(¹) Ahora bien, para determinar si en el caso de autos la demanda expone una reclamación que justifique la concesión de un remedio, hay que resolver dos cuestiones fundamentales: (1) ¿Puede un tribunal en Puerto Rico decretar la modificación o cancelación de esas servidumbres en equidad cuando han ocurrido cambios radicales en la vecindad del área restringida? y (2) ¿Basta que la Junta de Planificación apruebe los planos de una urbanización para que *ipso facto* queden sin efecto las servidumbres en equidad, en tanto impidan la construcción de esa urbanización?

Dentro de la sistemática del Código Civil resulta muy difícil utilizar la figura jurídica de la servidumbre predial para imponer restricciones privadas sobre terrenos que van a ser urbanizados. En efecto, si con el carácter de cargas reales se pretende establecer restricciones referentes al uso y tamaño de los solares, al tipo y estilo de las casas o edificios, a las dimensiones de los patios, etc., hay que partir del supuesto de que los terrenos de la urbanización se hallaban ya gravados con las correspondientes y recíprocas restricciones cuando aún permanecían en plena propiedad del urbanizador enajenante. Por otro lado, es imprescindible que puedan establecerse restricciones cuyo contenido sea una verdadera obligación positiva de hacer, como prestación principal y no meramente como prestación accesoria. Así por ejemplo, a

---

(¹) *Glines* v. *Matta,* 19 D.P.R. 409 (1913) ; *Lawton* v. *Rodríguez,* 35 D.P.R. 487 (1926) ; *Macatee* v. *Biascochea,* 37 D.P.R. 1 (1927) ; *Lawton* v. *Rodríguez,* 38 D.P.R. 38 (1928) ; *Carrión* v. *Lawton,* 44 D.P.R. 463 (1933) ; *Fiol* v. *López de la Rosa,* 46 D.P.R. 749 (1934) ; *Santaella* v. *Purón,* 60 D.P.R. 552 (1942) ; *Baldrich* v. *Registrador,* 77 D.P.R. 739 (1954) y *Pérez* v. *Pagán,* 79 D.P.R. 195 (1956).

menudo es necesario obligar al dueño del predio sirviente en una urbanización a la ejecución de actos positivos tales como la construcción de un parque, de una escuela o de un casino para beneficio de los futuros adquirentes de los demás solares y casas de la urbanización. Sin embargo, la servidumbre predial en el derecho civil nunca se produce si el fundo sirviente pertenece al dueño del fundo dominante ya que entonces actúa la regla "nemini res sua servit". O lo que es igual, la servidumbre real que admite el Código Civil sólo se concibe como un derecho real limitado *en una cosa ajena*. Y también es cosa harto sabida que no se permiten en el derecho civil servidumbres reales que exigen una obligación de hacer, excepto en forma accesoria: *servitus in faciendo consistere nequit.*

Las necesidades prácticas que crean los recientes desarrollos urbanísticos han motivado ásperas críticas a las reglas de "nemini res sua servit" y de "servitus in faciendo consistere nequit" en muchos países de derecho civil, tales como Alemania, Bélgica y Suiza. Véase Schmidt-Rimpler, La Servidumbre a favor del Propietario (1931), Rev. Crit. de Derecho Inmobiliario 14, 93, 178, 321. Enneccerus, Kipp & Wolff reconocen que "son muchas las razones en pro de la necesidad de la servidumbre de propietario," precisamente cuando se trata de cargas de urbanización. Tratado de Derecho Civil, tomo IV, vol. 2 (2a ed., trad. esp., 1951) 40–41. Cf. Hedemann, Tratado de Derecho Civil, vol. II (trad. esp. 1955) 350–351. La doctrina y la jurisprudencia en Bélgica también han luchado con los obstáculos jurídicos que existen para crear servidumbres verdaderamente positivas e imponer cargas de urbanización sobre un solo fundo. De Page nos dice que los intereses prácticos exigen que esas cargas de urbanización constituyan servidumbres de carácter real y analiza los medios que sirven para eludir en la práctica el rigor de la ley. Concluye que: "La regla *servitus in faciendo consistere nequit* . . . se encuentra hoy día tambaleante. El día vendrá quizás en que se admitirá que una servidumbre consiste en

hacer algo positivo, siempre que se trate de un acto que revista interés público. No sería la primera vez que los principios individualistas de la legislación romana tendrían que ceder ante el derecho del futuro." *Traité Elementaire du Droit Civil Belge*, tomo VI (1953) 402–05, 406–08, 501–75. Cf. 3 Planiol y Ripert, *Traité Pratique de Droit Civil Francais* (2a ed. 1952) 866–79, 916–84. Y el Código Civil suizo autoriza en su art. 733 a todo dueño a establecer una servidumbre sobre un fundo de su propiedad a favor de otro inmueble de su misma pertenencia. En la *"Exposición de Motivos"* se da la siguiente justificación: "Esta institución puede ser de una gran utilidad. Basta pensar en la construcción de toda una urbanización sobre una finca que originalmente ha pertenecido a un solo dueño. Éste puede crear desde el principio, sobre todas las parcelas destinadas a ser vendidas más adelante, las servidumbres apropiadas para la totalidad del proyecto de urbanización." Rossel, *Code Civil Suisse* (7a ed. 1948) 249. Véase además Tuor, *Le Code Civil Suisse* (2a ed. fr. 1950) 534–35. Cf. Ossorio Morales, Las Servidumbres "in faciendo" en Derecho Español, 21 Rev. Derecho Privado 177 (1934).

No tiene nada de extraño, pues, que desde 1913— cuando se resolvió el caso de *Glines* v. *Matta*, 19 D.P.R. 409— la doctrina jurisprudencial en Puerto Rico haya incorporado en nuestro derecho lo que se denomina "servidumbre en equidad". La incorporación o adopción de esa institución se llevó a cabo a través del recurso de injunction que autorizó la Ley de 8 de marzo de 1906. Véase 32 L.P.R.A. secs. 3521–3533. Por tanto, aunque el injunction es en principio un medio procesal para hacer valer las determinaciones judiciales, en lo referente a las cargas reales de urbanización sirve de base a las reglas de carácter sustantivo vigentes en nuestro derecho. Así se comprueba que todavía hoy día el derecho sustantivo brota y se desarrolla por los intersticios del procedimiento. De aquí que en Puerto Rico las restricciones al derecho de propiedad impuestas sobre terrenos que van a ser urbanizados

no se consideran servidumbres prediales sujetas a lo dispuesto en el Código Civil en relación con éstas. Son servidumbres que se regulan por los principios de equidad del derecho angloamericano siempre que éstos no estén en conflicto con las leyes vigentes en nuestro país. Consecuencia: mediante una servidumbre en equidad, el dueño de una propiedad a urbanizarse puede constituir por sí solo un gravamen sobre su fundo propio y también puede establecer una carga real que imponga una obligación de hacer como prestación principal. Asimismo, el titular del gravamen en equidad no dispone de una acción real confesoria para hacer reconocer sus derechos ni de una acción posesoria cuando vea perturbada su posesión. Sin duda cabe el recurso de injunction para obligar al dueño del predio sirviente a cumplir con la obligación que le impone la servidumbre en equidad. Pero la diferencia es obvia. El demandado en la acción de injunction puede oponer todas las defensas que le otorgan los principios de equidad. Por ejemplo, cabe invocar como defensas la incuria (*laches*), el impedimento (*estoppel*), el consentimiento (*acquiescence*), la conciencia impura (*unclean hands*), etcétera.

No hay duda que la jurisprudencia constante de este Tribunal así lo tiene declarado. En *Glines* v. *Matta*, supra, la entidad urbanizada impuso a la finca Miramar en Santurce las restricciones siguientes: (1) que todo comprador de un solar "debía sujetarse y quedaba obligado . . . a la responsabilidad de las construcciones y obras de calles, aceras, alcantarillados y cañerías de agua a prorrata del costo de ella, las cuales serían llevadas a cabo por la expresada compañía, siempre que los adquirentes de los solares situados en una calle lo solicitaran, o antes sin este requisito si así la compañía lo estimaba oportuno;" y (2) que "ningún edificio, construcción, balcón, ventana salediza u otra edificación, excepto escaleras o gradas, se harán en estos solares a menos de tres metros de distancia de la línea de su frente que da a la calle en que se encuentra situado". La compañía consignó dichas restricciones en una escritura, ". . . la que inscribió en el Re-

gistro de la Propiedad; y como cada solar había de ser inscrito en el registro, hizo mención [al] acuerdo [imponiendo las restricciones] como emanado e impuesto por la aludida compañía". Al confirmar la sentencia que declaró con lugar una petición de injunction para obligar a los compradores de un solar en Miramar a cumplir con la segunda restricción, resolvimos que los demandantes como dueños de otros solares en la misma urbanización ejercitaban un derecho real y que ese derecho surgió de las cláusulas restrictivas de la escritura que creaban "servidumbres en equidad". Declaramos que ". . . las cortes en Puerto Rico no tienen jurisdicción general en equidad . . . pero tienen por virtud de la Ley de Injunctions jurisdicción para impedir las infracciones de los derechos. Al decretarse la Ley de Injunctions, la Legislatura necesariamente adoptó por lo menos cierta parte de aquella que está vigente en los Estados Unidos". (Pág. 415–416.) Allí también se reconoció a la parte demandada, en el pleito de injunction instado para hacer valer el gravamen en equidad, el derecho a invocar las defensas de *laches, estoppel* y *unclean hands*, aunque a base de la prueba ofrecida se llegó a la conclusión de que las mismas carecían de méritos.

Varios años más tarde, en *Lawton v. Rodríguez*, 35 D.P.R. 487 (1926), consideramos la validez de una restricción impuesta en un plano de urbanización sobre doce solares a ambos lados de una calle, al efecto de que "el comprador, sus herederos y sus sucesores se obligan en el caso de que se decidieran fabricar en el solar adquirido, a construir una sola casa la cual distará veinticinco pies del frente de la calle trazada . . ." Decidimos que la misma era válida porque las cláusulas restrictivas tienen fuerza legal "*siempre que sean razonables, obedezcan a un plan general de mejoras, consten específicamente en el título y se inscriban en el registro de la propiedad*". (Pág. 494.) Aunque dijimos de pasada que las restricciones impuestas por razones de orden sanitario y de ornato o embellecimiento caben dentro del concepto de las servidumbres positivas y negativas que define el Código Civil,

finalmente nuestro fallo se fundó en los principios de equidad invocados en el caso de *Glines*. Además se expresó que las restricciones de urbanización deben ser uniformes y que ". . . en consonancia con nuestra ley de *injunction* y la doctrina sentada en el caso de *Glines* . . . el mero hecho de que se falte al contrato es suficiente fundamento para la intervención de las cortes por injunction . . .", siendo innecesaria prueba adicional de daños. (Págs. 498–501.) En *Macatee* v. *Biascochea*, 37 D.P.R. 1 (1927) aplicamos de nuevo las doctrinas de equidad respecto a otra de las restricciones impuestas sobre los solares de la urbanización Miramar que disponía lo siguiente: "Estos solares no se destinarán a establecimientos comerciales o industriales, sino precisamente a construcciones de casas para habitación". Consideramos y rechazamos, a base de la prueba presentada, las defensas de derecho aducidas por la parte demandada, a saber: (1) *laches*, (2) *estoppel*, y (3) que la restricción de uso "no tiene más validez y efecto en virtud de cambios ocurridos en la vecindad próxima o inmediata a los edificios [propiedad de las partes]". En cuanto a esta última defensa indicamos con toda claridad que debía desestimarse porque la demandada ". . . no ha demostrado que el cambio que ha podido existir en Miramar por el uso a que se dedican tales edificaciones, ha sido de tal naturaleza que haya dejado sin valor sustancial el convenio o restricción en cuanto a la parte dominante residencial. Por lo menos las circunstancias en este caso no nos llevan a esa conclusión." (Págs. 10–11.) Así pues, se admitió que un cambio radical en la vecindad dentro del área restringida puede poner fin a la restricción de uso.

Esa doctrina de que cambios radicales en la vecindad pueden constituir una defensa en equidad o poner fin a la restricción fue también aceptada por este Tribunal Supremo en el caso de *Carrión* v. *Lawton*, 44 D.P.R. 463 (1933). Importa señalar sobre todo que en dicho caso se trataba de un pleito instado por Carrión para dejar sin efecto mediante decreto judicial la restricción que ya había sido declarada válida en

*Lawton* v. *Rodríguez*, supra. Se alegó que la referida restricción debía ser anulada porque debido al cambio de condiciones carecía de valor práctico alguno. Rechazamos esa contención diciendo lo siguiente: "Las condiciones existentes en la urbanización cuando se promovió el pleito original son prácticamente las mismas que existían cuando se inició el presente litigio. El mismo Carrión admite que no ha habido variación en 'Carrión's Court' desde hace más de cinco años. Esto lo declara en marzo de 1931. Es claro que el demandado Rodríguez Rivera tuvo oportunidad de alegar cualquier alteración o cambio que constituyese una buena defensa. *No se ha probado que de entonces a acá hayan ocurrido cambios que justifiquen el remedio solicitado por el demandante.* Opinamos que el Sr. Carrión está impedido de establecer esta defensa que no presentó su causante, cuando fue demandado seis años antes de haberse promovido esta acción. No se ha justificado que la corte inferior actuara movida por pasión, prejuicio o parcialidad. *Conviene hacer constar que de acuerdo con la prueba presentada, en los solares señalados con los números 1, 2 y 6 no se ha construído casa alguna. En el resto de la parcela se han construído nueve casas, excluyendo la del Sr. Carrión en el solar núm. 4 que ha sido mandada a destruir por orden judicial. En el solar núm. 5 aparece construída una casa y parte de otra, y lo mismo ocurre en el solar núm. 12. En los demás solares únicamente se ha construído una casa en cada solar, excluyendo la del Sr. Carrión, cuya destrucción ha sido ordenada.* El Sr. Carrión declaró que todas estas casas fueron construídas con anterioridad a la venta de Joy a Rodríguez, con excepción de una que construyera la Srta. Ana A. Márquez en el solar núm. 5." (Págs. 479–480.) (Bastardillas nuestras.) Salta a los ojos que en dicha sentencia este Tribunal por segunda vez admitió que ciertos cambios en la vecindad pueden dar lugar a la extinción o alteración de las servidumbres en equidad. Por eso fue preciso examinar la prueba aducida para luego concluir que

no ocurrieron cambios "de entonces a acá que justifiquen el remedio solicitado por el demandante". ([2])

Pero es aún más clara y firme la contraposición entre servidumbre en equidad y servidumbre predial que se estableció en la sentencia dictada por este Tribunal en *Fiol* v. *López de la Rosa*, 46 D.P.R. 749 (1934). Allí el demandante quiso eludir la defensa equitativa de incuria (*laches*) instando una acción para el cumplimiento específico de la condición restrictiva en vez de acudir al recurso de *injunction*. Sin embargo, en ponencia del Juez Asociado Sr. Córdova Dávila, fallamos que eso no alteraba en nada el carácter de la reclamación porque ". . . *se solicita el cumplimiento de una condición restrictiva y precisamente son estas restricciones las que se regulan por los principios de equidad.*" (Pág. 755.) Así queda diáfano que tales restricciones de urbanización nunca pueden caracterizarse como servidumbres prediales aún cuando se soslaya el remedio procesal de injunction. Por lo mismo, al considerar la defensa de incuria (*laches*), se desestimó la contención de que esa defensa equitativa era inaplicable porque la restricción de uso sobre los solares de Miramar constituía una verdadera servidumbre predial negativa, sentando en definitiva la doctrina siguiente: "Creemos que en verdad se trata de algo parecido a una servidumbre, pero es lo cierto que ese algo, si bien tiene raíces muy hondas en el derecho histórico, por vez primera surgió en toda su integridad y tal como se presenta en este caso al iniciarse en esta Isla las llamadas urbanizaciones a virtud de las cuales lotes de terreno de mayor o menor extensión se dedican a la construcción de edificios incluyendo calles, aceras, alcantarillado, acueducto y alumbrado, total o parcialmente, según reglas previamente establecidas, debiendo en tal virtud interpretarse esas reglas de acuerdo con los principios de derecho a la luz de los cuales se han venido interpretando en los estados de su origen, siempre desde luego que no estén esos principios en conflicto con

---

([2]) En el mismo sentido, véase *Lawton* v. *Rodríguez*, 38 D.P.R. 38, 54 (1928).

las leyes en vigor en Puerto Rico. En los propios casos que invoca el apelante [*Glines* y *Lawton*] la corte en el primero dijo, por voz de su Juez Asociado Sr. Wolf, que se trataba de algo equivalente a un gravamen o servidumbre y en el segundo por voz de su Juez Asociado Sr. Franco de algo que participaba en su esencia de la naturaleza de determinadas servidumbres, pero para la resolución de ambos casos se aplicaron principios de equidad, de acuerdo con la jurisprudencia establecida por las cortes americanas sobre el particular." (Págs. 754–755.)

Dicha doctrina se reafirmó en *Santaella* v. *Purón*, 60 D.P.R. 552 (1942). En ese caso aplicamos los principios de equidad para determinar los derechos que surgían de una restricción de uso sobre los solares de Miramar. A base de la prueba se rechazaron las defensas de incuria (*laches*) y de impedimento (*estoppel*). Además, considerando la restricción como una servidumbre en equidad, se declaró que basta probar la violación de la misma para justificar un injunction, sin necesidad de probar daños reales o perjuicios sustanciales. A idénticas conclusiones llegamos en *Pérez* v. *Pagán*, 79 D.P.R. 195 (1956).

Bastará añadir, para terminar con este análisis de nuestra jurisprudencia, que por analogía con la servidumbre predial del derecho civil usamos los términos de "predios sirvientes" y "predios dominantes" en *Baldrich* v. *Registrador*, 77 D.P.R. 739 (1954), al decidir que las servidumbres en equidad crean derechos reales inscribibles en el Registro de la Propiedad. Por eso la cancelación de su mención o inscripción no se puede operar en el registro en virtud de una petición ex parte, sin que den su expreso consentimiento las personas a ser perjudicadas por dicha cancelación. De ahí no cabe inferir que las restricciones de urbanización crean verdaderas servidumbres prediales. De acuerdo con lo dispuesto en el art. 2 de la Ley Hipotecaria (30 L.P.R.A. sec. 2) y en el art. 27 del Reglamento Hipotecario (30 L.P.R.A. sec.

858), son inscribibles todos los derechos reales inmobiliarios, sin que éstos estén limitados a los que define el Código Civil. Es decir, en nuestro derecho positivo prevalece la teoría del *numerus apertus*, que admite la posibilidad de crear derechos reales fuera de los previstos y organizados por el Código Civil. Se deja a la jurisprudencia y a la doctrina la cuestión de precisar el carácter real de los distintos derechos subjetivos, según las conveniencias económicas de los contratantes.[3] Como la servidumbre en equidad tiene de ordinario el carácter y los efectos de un derecho real, a los fines del Registro no hay incoveniente en considerarla como una variante o modalidad de las servidumbres explícitamente reguladas por el Código Civil. Por esa razón es que tiene acceso al Registro el derecho de servidumbre en equidad, a pesar de que dicha figura jurídica ha sido acuñada por nuestra jurisprudencia. Precisamente en el caso de *Baldrich* se trataba de un gravamen que el dueño de los terrenos a ser urbanizados había impuesto por sí solo sobre un fundo propio. La inscribibilidad no podía justificarse a base de que se había constituído una servidumbre predial ortodoxa. Cf. 15 Rev. Jur. de la U.P.R. 195, 200–201 (1955).

---

[3] Como indica Puig Brutau, ". . . no es lo mismo determinar si es posible crear algún derecho real, aparte de los regulados por el Código, que saber si esta creación, en caso afirmativo, carece de límites." 3 Fundamentos de Derecho Civil (1953) 32. Hay una serie de derechos reales explícitamente reconocidos por ley. Pero existen otros innominados que la jurisprudencia y la doctrina aceptan cuando pueden asimilarse o son variantes de las figuras jurídicas admitidas por los preceptos civiles. Ibid., 31–35; 2 Roca Sastre, Derecho Hipotecario (5a ed.) 188–192; 2 Castán, Derecho Civil Español, Común y Foral (6a ed.) 7–29; Puig Peña, Tratado de Derecho Civil Español, tomo III, vol. 1 (1951) 10–21; 2 Borrell y Soler, Derecho Civil Español (1955) 427–432; y Lacruz Berdejo, Lecciones de Derecho Inmobiliario Registral (2a ed. 1957) 110–120. Ahora bien: no estamos resolviendo *a priori* que todos los derechos denominados servidumbres en equidad tengan el carácter y los efectos de un derecho real a los fines del Registro. Todo depende de la naturaleza del derecho específico de que se trate. Pero no hay razón para limitar con excesivo rigor la categoría de los derechos reales, sin razones prácticas para ello, como aparentemente es la tendencia de la doctrina española inspirada en teorías abstractas derivadas de autores alemanes.

 Resulta, pues, que las disposiciones del Código Civil no determinan cuándo puede tener lugar la modificación y extinción de las servidumbres en equidad. Ya hemos resuelto que la creación, el contenido y el alcance de estas cargas reales de urbanización se rigen por los principios que ha desarrollado y aplicado el derecho de equidad. Lógicamente hay que completar la incorporación de esta figura jurídica en nuestro derecho. Si le aplicamos los modos de extinción y modificación de las servidumbres prediales del derecho civil, la institución quedaría mutilada, trunca e incompleta. Además, en vista de la rapidez del crecimiento y de los cambios en nuestros centros urbanos, es imprescindible una regla jurídica que permita erradicar restricciones privadas obsoletas. La doctrina de equidad referente a la extinción por cambios radicales del vecindario se ajusta de manera admirable a esta necesidad. En cambio, ninguno de los modos de extinción y modificación de las servidumbres prediales en nuestro derecho civil permite proteger adecuadamente ese interés público. Como dice Puig Brutau, "La máxima expresión del principio de que las servidumbres han de ejercitarse *civiliter* sería una regla que dijera así: la servidumbre se extinguirá cuando los predios vengan a tal estado que *no sea necesario* el uso de la servidumbre en lo sucesivo." 3 Fundamentos de Derecho Civil, (1953) 425. Pero la regla expresada no se incluye en el art. 482 de nuestro Código Civil, aunque sí se concreta en el caso particular de la servidumbre de finca enclavada. Art. 504 del Código Civil, 31 L.P.R.A. sec. 1735.

 De conformidad con los principios de equidad, las restricciones privadas que constituyen servidumbres equitativas se modifican o extinguen en los siguientes casos: (1) por convenio de los interesados, ya sea mediante rescisión total o parcial de las cláusulas restrictivas o mediante la constitución de nuevas restricciones que alteren las anteriores; (2) por efecto del tiempo o por realizarse la condición si las restricciones se han constituído a término o de modo condicional; (3) por reunirse en una misma persona la propiedad

de todos los predios llamados "sirvientes" y "dominantes" (confusión) ; (4) por renuncia o abandono de los propietarios que reciben los beneficios de la servidumbre mediante conducta que demuestre una intención concluyente de renunciar o abandonar los mismos; (5) por expropiación forzosa del predio sirviente si los gravámenes en equidad son incompatibles con el uso público del inmueble expropiado; y (6) cuando cambios radicales del vecindario no sólo hacen la restricción irrazonable y opresiva para el dueño del predio sirviente, sino también destruyen el valor que la restricción tenía para el dueño del predio dominante, por lo cual resulta en verdad imposible alcanzar los fines que perseguía la servidumbre.[4] Es esta última causa de modificación o extinción que nos interesa delimitar con rigor en el caso de autos.

Pero antes de intentarlo conviene aclarar dos cuestiones. La primera es ésta: aparte de los casos en que la servidumbre queda modificada o extinguida, el derecho de equidad reconoce como defensas personales varios motivos y circunstancias referentes a "las equidades personales entre los litigantes". Ya mencionamos la defensa de *unclean hands* —cuando el demandante ha violado con repetición las restricciones que pretende poner en vigor mediante injunction. Además se señalaron otras como la de consentimiento (*acquiescence*)—cuando el demandante ha permitido que otras personas violen las restricciones, siempre que esas violaciones sean de carácter sustancial y permanente—, la de in-

---

[4] Véanse 5 *Restatement, Property* (1944) secs. 528 y siguientes; 2 Casner y otros, *American Law of Property* (1952) secs. 9.24–9.90; Chafee, Simpson and Maloney, *Cases on Equity* (3a ed. 1951) 416–495; McClintock, *Handbook of the Principles of Equity* (2a ed. 1948) 336–353; 4 Pomeroy, *Equity Jurisprudence* (5a ed. 1941) 846–856; Williams, *Restrictions on the Use of Land: Equitable Servitudes*, 28 Tex. L. Rev. 194 (1949) ; Notas en 4 A.L.R.2d 1111; 88 A.L.R. 405; y 54 A.L.R. 812. Compárese los modos de extinción y modificación de las servidumbres prediales ortodoxas en nuestro derecho civil: 2 Castán, Derecho Civil Español, Común y Foral (9a ed. 1957) 562–565; 3 Puig Brutau, Fundamentos de Derecho Civil (1953) 406–412; y Puig Peña, Tratado de Derecho Civil Español, tomo III, vol. 1 (1951) 393–414.

curia (*laches*), la de impedimento (*estoppel*), etcétera. Ninguna de estas defensas puede afectar el derecho de los dueños de otros solares dominantes que no han incurrido en tal descuido, culpa o negligencia. Además no impiden reclamar daños y perjuicios por la violación de una restricción, aunque se determine que justifican denegar el remedio de injunction para hacer valer la servidumbre en equidad. Véase Casner y otros, *op. cit.* supra, sec. 9.38. El segundo punto que debe aclararse es que los cambios radicales en el carácter del vecindario pueden constituir tanto una defensa, si se invocan en un pleito de injunction entablado por el dueño del predio dominante, como base para una acción a instancia del dueño del predio sirviente encaminada a obtener una declaración judicial de que la servidumbre en equidad ha quedado modificada o extinguida. Obviamente sería irracional obligar al propietario del predio sirviente a violar las restricciones para averiguar cuáles son sus derechos y determinar si, a pesar de los cambios en la vecindad, los tribunales pondrían en vigor mediante injunction las restricciones que impone una servidumbre en equidad. Y no hay razón jurídica para ello, pues desde 1931 existe en Puerto Rico un estatuto autorizando en forma muy liberal las sentencias declaratorias. Ley núm. 47 de 25 de abril de 1931 (Leyes, pág. 379) ; 32 L.P.R.A. secs. 2991–3006. Cf. *Moscoso* v. *Rivera*, 76 D.P.R. 481 (1954) ; *Llopiz* v. *Arburúa*, 72 D.P.R. 531 (1951) ; y *Gual* v. *Pérez*, 72 D.P.R. 609 (1951). Cabe un remedio declaratorio siempre que exista una controversia real y efectiva entre las partes y sea posible disipar dudas e incertidumbres respecto a los derechos de éstas, mediante una sentencia que ponga fin a dicha controversia. El propósito de la sentencia declaratoria es precisamente obviar la inseguridad y los peligros de "un salto en la oscuridad" cuando hay una controversia jurídica genuina entre las partes. Vale decir, que éstas no tienen por fuerza que actuar sin saber de antemano cuáles son sus derechos y obligaciones. Además ha de tenerse presente que en los estados donde rige la Ley Uniforme de Sentencias Decla-

ratorias—idéntica a la que está en vigor desde 1931 en Puerto Rico—la jurisprudencia de los tribunales admite que procede un decreto declaratorio para determinar el efecto de cambios radicales en el vecindario sobre restricciones recíprocas en equidad. Ese decreto judicial puede ser—hay que subrayarlo —afirmativo o negativo en cuanto a su forma y efectos. Pero siempre tiene la eficacia y vigor de una sentencia final sobre los derechos de las partes que poseen fundos sirvientes o dominantes en el área restringida. Véanse *Marra* v. *Aetna Construction Co.*, 101 P.2d 490 (Cal. 1940); *Hess* v. *Country Club Park*, 2 P.2d 782 (Cal. 1931); *Lacov* v. *Ocean Ave. Building Corp.*, 178 N.E. 559 (N. Y. 1931); *McArthur* v. *Hood Rubber Co.*, 109 N. E. 162 (Mass. 1915); *Needle* v. *Clifton Realty Corp.*, 73 A.2d 895 (Md. 1950); Borchard, *Declaratory Judgments* (2a ed. 1941) 375, 946–950; 2 Anderson, *Actions for Declaratory Judgments* (2a ed. 1951) 1339–1344; Nota, *Developments in the Law—Declaratory Judgments* 1941–1949, 62 Harv. L. Rev. 787 (1949). Así pues, según nuestra Ley Uniforme de Sentencias Declaratorias, cabe conceder al dueño del fundo gravado con restricciones en equidad un remedio afirmativo si han ocurrido cambios radicales en el vecindario: la declaración judicial sobre modificación o extinción de dichas restricciones. *Cf. Carrión* v. *Lawton*, 44 D.P.R. 463 (1933) y *Lawton* v. *Rodríguez*, 38 D.P.R. 38, 54 (1928). Véanse Casner y otros, *op. cit.*, supra, sec. 9.39; Simpson, *Fifty Years of American Equity*, 50 Harv. L. Rev. 171, 216–217 (1936); y Nota en 4 A.L.R.2d 1111, 1117–1138 (1949).

▮▮▮▮▮ Ahora bien, con estas ideas previas a la vista, ¿cuáles son y en qué consisten los cambios del vecindario que pueden determinar la extinción o modificación de una servidumbre en equidad? Se exige que sean de carácter radical y permanente, e impidan sustancialmente la consecución de las ventajas y de los beneficios establecidos a favor de los predios dominantes. En otras palabras, si por razón de cambios radicales y permanentes en las condiciones del vecindario,

resulta prácticamente imposible realizar o lograr los fines que perseguía la servidumbre en equidad, entonces ésta queda modificada o extinguida. Adviértase que para ello dichos cambios deben: (1) convertir la restricción en una carga irrazonable y opresiva para el dueño del predio sirviente; (2) destruir el valor que de otro modo tendría la restricción para los dueños de los predios dominantes; y (3) frustrar por completo y permanentemente el propósito u objeto de la restricción. Es preciso cumplir con estos tres requisitos para que se justifique poner fin a la restricción. Además, los cambios del vecindario tienen que afectar en la forma antes señalada a la totalidad de los solares comprendidos dentro del área restringida. No basta que una parte de dicha área, situada al borde o a orillas del distrito que no está sujeto a restricciones, sufra el impacto de los referidos cambios, si hay solares o porciones interiores del área restringida que todavía pueden recibir las ventajas y beneficios establecidos a su favor mediante la servidumbre equitativa. Es decir, las restricciones no pueden extinguirse mediante un proceso gradual de abrogación que empieza con los solares al borde del área restringida y se extiende paso a paso hasta las porciones o solares situados en el centro de los terrenos restringidos. Y un mero cambio en las condiciones económicas del área circundante, que afecta el valor en el mercado de la propiedad, no produce por sí solo la extinción o modificación de las restricciones en equidad.(5) Claro está, pueden considerarse tanto los cambios acaecidos dentro del área restringida como las alteraciones sobrevenidas en los terrenos que la rodean. Pero cuando el cambio del vecindario se debe a violaciones de las restricciones en el área sujeta a las servidumbres en equidad

---

(5) *Jackson* v. *Stevenson*, 31 N. E. 691 (Mass. 1892); *Dolan* v. *Brown*, 170 N. E. 425 (Ill. 1930); *Hunter* v. *Wood*, 120 Atl. 781 (Pa. 1923); *Ockenga* v. *Alken*, 41 N.E.2d 548 (Ill. 1942); *Marra* v. *Aetna Construction Co.*, 101 P.2d 490 (Cal. 1940); 4 A.L.R.2d 1111 (1949) y los casos allí citados; 2 Casner y otros, *op. cit.* supra, sec. 9.39; y 5 *Restatement of Property* (1944) sec. 564.

se plantea más bien un caso de abandono o renuncia de las mismas. (⁶)

Vemos pues, con irrecusable claridad, que el tribunal de instancia incidió en error de derecho al desestimar la acción a base de que la demanda no aducía una reclamación válida. En efecto, considerando todas las alegaciones expuestas por los demandantes, evidentemente podría justificarse la concesión de un remedio conforme a las reglas jurídicas que rigen las servidumbres en equidad. Con palabras que de puro haber sido usadas ya constituyen un estribillo, repetimos que ". . . no procede desestimar una demanda a menos que aparezca con certeza que el demandante no tiene derecho a reme-

---

(⁶) Cabe hacer aquí una triple advertencia. En primer lugar, lo expresado en esta opinión se aplica únicamente a las servidumbres en equidad, es decir, a las restricciones privadas que constituyen cargas reales de urbanización, y en nada se refiere a las servidumbres prediales ortodoxas de nuestro derecho civil. En segundo lugar, es claro también que en Puerto Rico no existe el dualismo entre "equidad" y "derecho" que caracteriza al derecho angloamericano. Sólo pueden invocarse principios de equidad en relación con determinadas instituciones que han sido incorporadas en nuestro derecho por legislación o por doctrina jurisprudencial a partir de los textos de ciertas leyes como la de "trusts", la de "injunctions", etcétera. Cf. *Pueblo* v. *Escambrón Beach Club*, 63 D.P.R. 761 (1944) ; *Belaval* v. *Tribunal de Expropiaciones*, 71 D.P.R. 265 (1950) ; *Álvarez* v. *Srio. de Hacienda*, 80 D.P.R. 16 (1957) ; *Rossy* v. *Tribunal Superior*, 80 D.P.R. 729 (1958). Véanse Gutteridge, *Comparative Law* (2d ed. 1949) 96–100; Rabasa, El Derecho Angloamericano (1944) 136–458; Friedmann, *Legal Theory* (3a ed. 1953) 379–382; Castán, La Formulación Judicial del Derecho—Jurisprudencia y Arbitrio de Equidad (2a ed. 1954) ; Jolowicz, *Roman Foundations of Modern Law* (1957) 54–60; David, *Introduction a L'etude du Droit Privé de L'Angleterre* (1948) 172–199; 2 Arminjon, Nolde y Wolff, *Traité de Droit Comparé* (1950) 510–529; Puig Brutau, Estudios de Derecho Comparado (1951) 97–136; *Id.*, La Jurisprudencia como Fuente del Derecho (s.f.). En tercer lugar, cuando hablamos de "extinción o modificación" por cambios radicales en el carácter del vecindario, el término "modificación" sólo se refiere a la cancelación o extinción de una o varias restricciones dentro de un conjunto o serie de restricciones relacionadas entre sí. La única función del tribunal es determinar qué restricciones han quedado extinguidas. No corresponde al tribunal *rehacer* el contrato entre las partes: por ejemplo, reduciendo la cabida mínima de los solares de un acre a mil metros. Si la restricción privada en cuanto al tamaño mínimo de los solares ha quedado extinguida, entonces sólo prevalece la limitación que imponga la Junta de Planificación. Pero es obvio que dicha restricción puede haberse extinguido, aunque las demás subsistan. Este último sería un caso de "modificación" de las restricciones equitativas.

dio alguno bajo cualquier situación de hechos que puedan probarse como fundamento de su reclamación," y que ". . . al resolver sobre la validez de una moción para desestimar [una demanda] por falta de hechos, el deber de la corte no es determinar los méritos finales de la reclamación con el propósito de decidir cuál de las partes debe prevalecer. Su deber más bien es considerar si a la luz de la situación más favorable al demandante y resolviendo toda duda a favor de éste, la demanda es suficiente para constituir una reclamación válida." *Boulon* v. *Pérez*, 70 D.P.R. 988, 993 (1950); *González* v. *Hawayek*, 71 D.P.R. 528, 533 (1950) y *Cruz* v. *Ortiz*, 74 D.P.R. 321, 325–26 (1953). En suma: fallamos que la demanda en este caso aduce una causa de acción según la doctrina jurídica vigente sobre los cambios del vecindario que producen la extinción o modificación de una servidumbre en equidad. No pretendemos, desde luego, prejuzgar en forma alguna el resultado del litigio. Lo único que resolvemos es que la demanda como cuestión de derecho expone una reclamación válida.

## II

Ahora corresponde examinar la segunda cuestión que planteamos al preguntarnos si la demanda aducía una causa de acción: ¿Basta que la Junta de Planificación apruebe los planos de una urbanización para que *ipso facto* queden sin efecto las servidumbres en equidad, en tanto impidan la construcción de esa urbanización? A nuestro juicio la respuesta es clara. El hecho de que la Junta de Planificación haya aprobado la construcción de la urbanización a que se alude en la demanda, no tiene el efecto de anular las restricciones privadas que pueden impedir su construcción. Conforme dijimos en *Pérez* v. *Pagán*, 79 D.P.R. 195: "Nada hay en la Ley de Planificación, 23 L.P.R.A., secs. 1–54, ni en los reglamentos aprobados por la Junta a virtud de esa Ley, que indique que la mera concesión de un permiso de construcción tenga el efecto y alcance de anular restricciones privadas que resulten inconsistentes con el permiso concedido. El otorgar un

permiso de construcción es un deber ministerial, cuando la solicitud que al efecto se presenta cumple estrictamente con los requisitos de ley o de los reglamentos al efecto aprobados. Yokley, *Zoning Law and Practice*, Vol. 1, segunda ed., sec. 99, pág. 234. Cf. *Deliz v. Junta de Apelaciones*, 71 D.P.R. 138, 141. La situación que surge es análoga a cuando un reglamento de zonificación permite para un distrito un uso que está prohibido por restricciones convencionales. Existe copiosa jurisprudencia al efecto de que en tales casos prevalecen las restricciones." (Pág. 198.) Los reglamentos de zonificación y la aprobación de los planos de la urbanización en cuestión *permiten* pero no exigen que la propiedad de los demandantes se dedique a usos *más amplios* que los indicados por las restricciones privadas. En este caso no hay conflicto directo entre ambos tipos de limitaciones pues éstas son obviamente de carácter negativo. Por lo mismo, si los reglamentos de zonificación fuesen más estrictos que las restricciones privadas de carácter negativo, tampoco habría conflicto directo entre ambos tipos de limitaciones: en tal caso esas restricciones privadas autorizarían pero no exigirían que la propiedad se dedicase a los usos prohibidos por los reglamentos de zonificación. Sólo podría existir un conflicto si las restricciones privadas limitaran la propiedad a ciertos usos que están expresamente prohibidos por un reglamento de zonificación o por una decisión de la Junta de Planificación. Véanse 2 Metzenbaum, *The Law of Zoning* (2a ed. 1955) 1108-1112; 2 Rathkopf, *The Law of Zoning and Planning* (3a ed. 1956) 387-392; *Burgess v. Magarian*, 243 N. W. 356 (Iowa 1932); *Wilkman v. Banks*, 269 P.2d 33 (Cal. 1954); *Equitable Restrictions and Government Regulation of Private Land Use*, 10 Syracuse L. Rev. 78 (1958); Van Hecke, *Zoning Ordinances and Restrictions in Deeds*, 37 Yale L. J. 407 (1928); 2 Casner y otros, *op. cit.* supra, sec. 9.40 y 4 A.L.R.2d 1111 (1949). Adviértase que el art. 16 del antiguo Reglamento de Planificación disponía que "cuando las disposiciones de este Reglamento resultaren en conflicto con cláusulas o limitacio-

nes de convenios o contratos privados relacionados con aspectos de zonificación, regirán las más restrictivas". Reglamento de Planificación núm. 4 (1946) pág. 19. Este artículo fue derogado en 1951. Desde entonces los reglamentos de zonificación no contienen disposición alguna sobre esta materia. Véase el Nuevo Reglamento de Planificación núm. 4 (1955).

Aplicando estos principios podemos decir, sin temor a equivocarnos, que la aprobación de los planos de la urbanización aludida no basta para que *ipso facto* queden sin efecto las restricciones privadas que limitan el uso de la propiedad de los demandantes. Sin embargo, conviene indicar que los reglamentos de zonificación y la aprobación de los planos de la urbanización por la Junta son hechos que el tribunal de instancia deberá tener en cuenta, junto con la demás prueba que se presente en el juicio, para determinar si las restricciones privadas han quedado extinguidas por cambios radicales del vecindario. Chafee, Simpson y Maloney, *op. cit.* supra, 495; Simpson, *Fifty Years of American Equity*, 50 Harv. L. Rev. 171, 218; Nota en 29 Mich. L. Rev. 112 (1930). Al fijar las zonas de uso y los requisitos para otorgar permisos de construcción o de urbanización, la Junta de Planificación tiene que considerar las características de la vecindad y del área total de la región zonificada. Sus conclusiones a ese respecto no son concluyentes cuando se trata de determinar si por cambios radicales del vecindario se ha extinguido o modificado una restricción privada. Pero los tribunales tampoco pueden hacer caso omiso de esas determinaciones administrativas que reflejan el interés general de la comunidad. Cf. *López* v. *Junta de Planificación*, 80 D.P.R. 646, 662–663 (1958).

### III

El tribunal a quo también fundamentó su sentencia en la doctrina de cosa juzgada (*res judicata*). Expresamente señaló que: "Esta misma sala del Tribunal Superior se

negó a hacer lo que ahora pretende el demandante. Nos referimos a la sentencia que dictáramos el día 16 de agosto de 1951, la cual es firme por no haberla apelado Roberto Colón en el caso titulado Civil núm. R-4321, Roberto Colón v. Frank Ramírez de Arellano, sobre Sentencia Declaratoria." Ese pronunciamiento del tribunal de instancia se basó exclusivamente en las alegaciones. Ni la sentencia anterior ni el récord del caso núm. R-4321 fueron presentados en evidencia. Aun más: nunca se practicó prueba alguna ante el tribunal sentenciador sobre ese particular. Los demandados tampoco presentaron affidavits, deposiciones o admisiones para suscitar la cuestión de *res judicata* bajo la Regla 12 (b) (6) o bajo la Regla 56. Cf. *Ramos* v. *Pueblo,* 67 D.P.R. 640 (1947); *Bithorn* v. *Santana,* 68 D.P.R. 300 (1948); *Sánchez* v. *De Choudens,* 76 D.P.R. 1 (1954); *Iturriaga* v. *Fernández,* 78 D.P.R. 31 (1955); *Sierra, Sec. Trabajo* v. *Bird,* 78 D.P.R. 170 (1955); *Rossy* v. *Tribl. Superior,* 80 D.P.R. 729 (1958); y 2 Moore's *Federal Practice,* secs. 12.07–12.10. Se limitaron a alegar en su contestación como defensa especial que: "La controversia planteada por la demanda ha sido ya definitivamente decidida en contra de las pretensiones de los demandantes por las sentencias dictadas por este Tribunal el día 12 de marzo de 1945 en los casos números R-442 y R-541, sobre Injunction, y por la sentencia dictada por este Tribunal el día 16 de agosto de 1951 en el caso número R-4321, sobre Sentencia Declaratoria, cuyas tres sentencias son hoy día finales, firmes e inapelables, y las mismas tienen el carácter de cosa juzgada entre las partes, tanto para las controversias y derechos que allí se adjudicaron como para aquéllas que pudieron y debieron plantearse en los respectivos litigios que dieron lugar a los mismos". Creemos que la controversia sobre *res judicata* así planteada no podía ser resuelta por el tribunal de instancia sin considerar la prueba que ambas partes pudieran presentar en el juicio correspondiente.

De la faz de la demanda no se desprende afirmativamente que la sentencia en el pleito anterior, número R-4321, fuera

cosa juzgada entre las partes sobre las cuestiones planteadas en el caso de autos. En el párrafo tercero de la demanda se hizo referencia a ese pleito anterior diciendo únicamente lo siguiente: "A los efectos de determinar la interpretación y alcance de dicha cláusula sexta anteriormente descrita (así como otras cláusulas de la escritura no pertinentes aquí) en cuanto a su propiedad, el co-demandante Roberto Colón Padilla acudió ante la antigua Corte de Distrito de Bayamón en un recurso de Sentencia Declaratoria, titulado Roberto Colón v. Ramírez de Arellano et al., Civil Núm. 4321, recayendo sentencia en tal litigio con fecha 16 de agosto de 1951, en la cual se resolvió que la finca propiedad de los demandantes se hallaba afecta y sujeta a todas las restricciones creadas en la anterior cláusula sexta." Ateniéndonos a lo que se alega en dicho párrafo de la demanda, resulta imposible determinar si existe la completa identidad entre las personas de los litigantes y las causas en ambos pleitos que es necesaria a los efectos de la cosa juzgada. Como tiene declarado la jurisprudencia reiterada de este Tribunal, aplicando las disposiciones del art. 1204 del Código Civil (ed. 1930), 31 L.P.R.A. sec. 3343, ". . . para invocar con éxito la defensa de cosa juzgada precisa no sólo la más perfecta identidad entre las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron, sí que también que la sentencia anterior por su naturaleza o por disposición de la ley resuelva definitivamente el asunto." *Muñoz* v. *Pardo*, 68 D.P.R. 612, 616 (1948); *Silva* v. *Doe*, 75 D.P.R. 209, 214 (1953); *Camacho* v. *Iglesia Católica*, 72 D.P.R. 353, 362 (1951); *Araújo* v. *Arenas*, 60 D.P.R. 284, 295-296 (1942); *Balasquide* v. *Luján*, 45 D.P.R. 563, 569-572 (1933). Lo que debe servir de base para resolver si están envueltas las mismas partes y la misma causa de acción, son los hechos de ambos pleitos y no la forma en que se titulen los recursos. *Dávila* v. *P. R. Ry., Light & P. Co.*, 44 D.P.R. 950, 958-963 (1933).

No hay duda que según la doctrina de *res judicata* un litigante no puede fraccionar su causa de acción. De ahí

que, estando envueltas las mismas partes y la misma causa de acción, una sentencia sea cosa juzgada en cuanto a todos los puntos que pudieron haber sido litigados y determinados en un pleito. Véanse *Miller* v. *Cía. Ron Carioca*, 71 D.P.R. 707 (1950) ; *Avellanet* v. *Porto Rican Express Co.*, 64 D.P.R. 693 (1945) ; *Pueblo* v. *Lugo*, 64 D.P.R. 554 (1945) ; *Sucn. Rivera* v. *Lugo*, 63 D.P.R. 14 (1944) y *Laloma* v. *Fernández*, 61 D.P.R. 569 (1943). Sin embargo, el efecto de una sentencia declaratoria respecto a controversias subsiguientes entre las partes, por vía de impedimento (*bar*) o de fusión (*merger*), depende del alcance de la declaración de derechos que se hace en la sentencia declaratoria. Una sentencia declaratoria no es concluyente en cuanto a cuestiones o derechos que pudieron haber sido adjudicados pero que de hecho no fueron objeto de una declaración en la referida sentencia. *Blanco* v. *La Capital*, 77 D.P.R. 642, 647 (1954). Véanse además *Restatement, Judgments* (1942) sec. 77; 10 A.L.R.2d 782 (1950) ; *Developments in the Law—Declaratory Judgments*, 62 Harv. L. Rev. 787, 840–844 (1949) ; *Developments in the Law–Res Judicata*, 65 Harv. L. Rev. 818, 881–882 (1952). Es decir, la sentencia declaratoria recaída en el pleito anterior (aún si hubiera identidad entre las personas de los litigantes) sólo sería *res judicata* si de hecho allí se suscitaron y verdaderamente o por necesidad se litigaron y adjudicaron las cuestiones que se plantean en el caso de autos. Por eso la aplicabilidad de la cosa juzgada no puede ser resuelta ni a favor ni en contra de los demandantes a base de las alegaciones. Ambas partes deben tener la oportunidad de demostrar y probar en el juicio correspondiente cuáles fueron las cuestiones y los derechos que en realidad se adjudicaron en el pleito sobre sentencia declaratoria núm. R-4321. (⁷)

---

(⁷) Adviértase que la doctrina de *res judicata* en cuanto a sentencias declaratorias opera en forma análoga a la doctrina del impedimento colateral en casos ordinarios. Bajo la doctrina del impedimento colateral, la sentencia anterior resulta concluyente si de hecho se litigaron y adjudicaron entre las mismas partes las cuestiones que se plantean en un pleito subsiguiente, aunque se trate de otra causa de acción. *Tartak* v. *Tribl. de Dis-*

 Nos parece insustentable la tesis de que a base del conocimiento judicial el tribunal de instancia podía aplicar la doctrina de cosa juzgada al caso de autos. En primer lugar, a los fines de resolver una controversia sobre *res judicata* planteada en un pleito, un tribunal no puede tomar conocimiento judicial de los procedimientos habidos y de la sentencia que se dictó en otra causa seguida ante él. Esta es la norma que siempre ha prevalecido en Puerto Rico de conformidad con lo dispuesto en el art. 36 de la Ley de Evidencia—art. 398 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 1711. Véanse *Vargas* v. *International Gen. Electric Co. of P. R.*, 60 D.P.R. 512, 518 (1942); *Figueroa* v. *Alonso*, 57 D.P.R. 500 (1940); *Aponte & Sobrino* v. *Sucn. Pérez*, 48 D.P.R. 449 (1935); *Dávila* v. *P. R. Ry., Light & P. Co.*, 44 D.P.R. 950 (1933). Cf. 96 A.L.R. 944 (1935); 30A Am. Jur., *Judgments*, secs. 437–473; y 20 Am. Jur., *Evidence*, secs. 86–88. Por otro lado, aún suponiendo que podía tomarse conocimiento judicial de los hechos que constan en el récord del pleito R-4321—porque pueden ser objeto de exacta e inmediata demostración recurriendo a fuentes de fácil acceso y de indisputable precisión—el tribunal tenía que dar a las partes una oportunidad razonable para que le sometieran información en cuanto a si procedía tomar conocimiento judicial de esa materia y además respecto a su contenido. Esto es imprescindible para proteger debidamente al tribunal y a las partes contra sorpresa e incertidumbre. Obviamente el tribunal a quo en el caso de autos no cumplió con dichos requisitos procesales.([8])

---

*trito*, 74 D.P.R. 862, 871–872 (1953); *Long Corporation* v. *Tribl. de Distrito*, 72 D.P.R. 788, 791–792 (1951); *Restatement, Judgments*, secs. 68–72 (1942); Scott, *Collateral Estoppel by Judgment*, 56 Harv. L. Rev. 1 (1942); y Polasky, *Collateral Estoppel—Effects of Prior Litigation*, 39 Iowa L. Rev. 217 (1954).

([8]) Véanse Morgan, *Some Problems of Proof Under the Anglo-American System of Litigation* (1956) 36–69; 1 Morgan, *Basic Problems of Evidence* (1954) 9–15; McCormick, *Handbook of the Law of Evidence* (1954) 687–712; 9 Wigmore, *Evidence* (3a ed. 1940) secs. 2568-2568a. Las reglas 801–806 de las Reglas de Evidencia para el Tribunal General de

En virtud de lo expuesto, *debe revocarse la sentencia recurrida y devolverse el caso al tribunal a quo para ulteriores procedimientos que no sean incompatibles con esta opinión.*

El Juez Presidente Sr. Negrón Fernández, aunque no estuvo presente cuando se firmó esta sentencia, participó en la consideración del caso y está de acuerdo con la opinión del Tribunal.

El Juez Asociado Sr. Belaval disintió.

Justicia adoptadas por este Tribunal Supremo y remitidas a la Asamblea Legislativa alteran la norma vigente en Puerto Rico: permitirían a un tribunal tomar conocimiento judicial de la sentencia y de los procedimientos en otro litigio para resolver una cuestión de *res judicata.* En efecto, lo que aparece en un récord judicial "son hechos específicos que pueden ser objeto de una inmediata y precisa demostración recurriendo a fuentes de fácil acceso y de indisputable precisión". Pero también se establece en las Reglas 803 y 804 un procedimiento adecuado para proteger los intereses de las partes. La Regla 803 dispone: "El juez deberá tomar conocimiento judicial de todas las materias especificadas en la Regla 802 si una parte lo solicita y proporciona suficiente información al juez que permita a éste propiamente dar cumplimiento a lo solicitado y, además, si ha dado a cada parte contraria aquella notificación que el juez crea necesaria a fin de que le permita enfrentarse a la solicitud." La Regla 804(1) exige que: "El juez informará a las partes sobre el contenido de cualquier materia de la cual él se proponga tomar conocimiento judicial y les dará oportunidad razonable para que le sometan información en cuanto a si procede tomar conocimiento judicial de dicha materia y sobre su contenido." Las referidas Reglas de Evidencia se adoptaron por primera vez el 13 de enero de 1958 y se remitieron a la Legislatura el 5 de febrero de 1958. Nuevamente fueron adoptadas el 9 de enero de 1959 y remitidas a nuestra Asamblea Legislativa con fecha 16 de enero de 1959.