ALBERTO CASTRO LUND y CARMEN AMPARO TORMOS DE CASTRO LUND, recurrentes, *v.* EL REGISTRADOR DE LA PROPIEDAD DE PONCE, recurrido.

*Número:* O-73-414        *Resuelto:* 29 de mayo de 1974

*Sarah Torres Peralta,* abogada de los recurrentes; el Registrador recurrido compareció por escrito.

EL JUEZ ASOCIADO SEÑOR CADILLA GINORIO emitió la opinión del Tribunal.

La Ponce Builders Corporation tenía inscrita como resto, una finca al folio 83 vuelto del tomo 603 [1] de Ponce, Puerto Rico, número 17,847, inscripción cuarta; con cabida de 34.9491 cuerdas. Este resto fue lotificado en 189 solares [2] y un área de parques, según un Plano de Urbanización de la Extensión La Rambla del barrio Machuelo Abajo de Ponce, Puerto Rico.

Al practicarse en el Registro de la Propiedad la inscripción de lotificación de dichos solares, el señor Registrador de la Propiedad relacionó en la inscripción *extensa,* que se hizo sobre uno de los 189 solares, y que resultó ser el Núm. 18,792 inscrito por su inscripción primera al folio 187 del tomo 658 de Ponce, ciertas "limitaciones de dominio y restricciones de edificación y uso" que la Ponce Builders Corporation impuso sobre los 189 solares segregados, a saber:

"(1) Todos los solares serán dedicados exclusivamente para la construcción de residencias de no más de dos pisos, además del sótano.

(2) Con excepción de los comprendidos en el área comercial (los números 300 al 306, ambos inclusive), en los cuales podrán construirse casas o edificaciones exclusivamente comerciales o industriales, o de carácter mixto, sin limitación del número de pisos.

(3) En los solares marcados con los números del 475 al 482, podrán construirse casas o edificios residenciales múltiples, siem-

---

[1] Véase nota aclaratoria al final de la Certificación del Registrador de la Propiedad unida a los autos.

[2] Todos los 189 solares son segregaciones de la finca original de 34.9491 cuerdas, lotificada, núm. 17,847, arriba mencionada.

pre y cuando no excedan la altura de tres pisos, además del sótano; pero ninguno de ellos podrá ser habilitado para hospitales, clínicas, dispensarios médicos, centros de cirugía, despachos farmacéuticos, casas de salud o empresas funerarias.

(4) No se construirá ninguna estructura de cualquier índole, que tenga un valor inferior a siete mil dólares ($7,000.00), sin solar, o un área de menos de setecientos (700) pies cuadrados.

(5) Estas edificaciones, si se trata de solares interiores, no podrán hacerse a menos de catorce (14) pies de distancia del borde interior de las aceras, a menos de diez (10) pies de las líneas laterales de las colindancias con los otros solares vecinos y a menos de seis (6) pies seis (6) pulgadas de distancia de la otra línea lateral colindante con el solar vecino del lado opuesto y a no menos de quince (15) pies de distancia de la colindancia posterior o fondo del solar.

(6) En los solares que forman esquina de manzanas, no podrá construirse a menos de catorce (14) pies de distancia del borde interior de las aceras respectivas de ambas calles, a menos de seis (6) pies seis pulgadas de la línea lateral del solar vecino ni a menos de quince (15) pies de la colindancia posterior del solar.

(7) Se prohíbe la construcción de estructuras de madera, hierro o zinc galvanizado y planchas de aluminio.

(8) Fuera de lo establecido anteriormente, no podrá construirse más de una casa en cada solar; y si fuera de dos plantas no podrá consistir de más de una vivienda en cada planta, para ser ocupada por una sola familia."

De los 189 solares segregados de la finca objeto de dicha lotificación, los recurrentes esposos Alberto Castro Lund y Carmen Amparo Tormos de Castro Lund, adquirieron por compra dos de ellos; ambos situados en la Extensión La Rambla del Barrio Machuelo Abajo, de Ponce, Puerto Rico, que se mencionan a continuación:

"(1) Solar con cabida superficial de 972.38 metros cuadrados, inscrito con el número 18,904 al folio 11 del tomo 663 de Ponce."

"(2) Solar con cabida superficial de 1104.38 metros cuadra-

dos, inscrito con el número 18,904 al folio 17 del tomo 663 de Ponce."

En la inscripción primera de cada uno de dichos dos solares, se expresa que:

"Sobre los solares segregados se imponen las limitaciones y restricciones relacionadas en la inscripción extensa citada."

Dicha nota se refiere a las "limitaciones de dominio y restricciones de edificación y uso", que la Ponce Builders Corporation impuso sobre todos los 189 solares, que fueron consignadas detalladamente en la inscripción extensa que se practicó al inscribir la finca número 18,792 a que nos hemos referido anteriormente.

Por instancia jurada de los referidos esposos Castro Lund-Tormos, de fecha 25 de abril de 1973, dirigida al Registrador de la Propiedad, sección o demarcación de Ponce, éstos solicitaron que se procediera a la cancelación de dicha anotación o mención: "Por constituir la referencia antes expresada una anotación inoficiosa o a lo sumo una mención inoficiosa también por improcedente, y de todas maneras caducada, por haberse tomado en ambos casos el 31 de octubre de 1956. . . ."

El Registrador referido se negó a practicar operación alguna en relación con dicha instancia, poniendo al pie de la misma una nota que copiada literalmente lee así:

"Devuelta esta instancia sin practicarse operación alguna en este Registro por no ser lo solicitado menciones de derechos reales, sino limitaciones y condiciones restrictivas sobre 189 solares en la Urbanización La Rambla relacionadas en la inscripción extensa que resulta ser la inscripción primera de la finca número 18,792 al folio 187 del tomo 658 de Ponce, cuya inscripción se practicó a virtud de la escritura número 3 de 31 de marzo de 1956 ante el notario Erasto Arjona Siaca, que motivó también las inscripciones primeras de los 189 solares segregados para beneficio mutuo. Ponce, a 5 de noviembre de 1973. (Fdo.) José V. Llauger Bosch—Registrador."

Esta nota fue notificada a la Lcda. Celsa Santiago, presentante del documento, en la misma fecha de la referida nota; y por no haber sido recogido el documento por ésta dentro del segundo día de dicha notificación, ([3]) y de conformidad con la Sec. 1772 de 30 L.P.R.A., el Registrador envió dicho documento a este Tribunal, con fecha 8 de noviembre de 1973.

Los esposos interesados radicaron también, con fecha 20 de noviembre de 1973, un Recurso Gubernativo contra dicha nota del señor Registrador de la Propiedad, alegando que: ". . . a los fines de proteger la jurisdicción de este Hon. Tribunal. . . " insta el recurso, por tener dudas ". . . de si en el caso de devolución de instancia sin practicarse operación alguna procede o no el recurso gubernativo automático que corresponde en los casos de denegatoria de inscripción." Expresa la recurrente que en el caso de entenderse en la afirmativa, entonces, que se considere el mismo como el alegato de los esposos interesados; y caso de entenderse en la negativa, se le considere como el Recurso Gubernativo que permite la ley dentro del término de 20 días desde la notificación de la nota del Registrador.

Sobre el procedimiento seguido en este caso por el Sr. Registrador de la Propiedad, la Sec. 1771 del Título 30 de L.P.R.A. dispone lo siguiente:

"Cuando el registrador deniegue o suspenda alguna inscripción, anotación o cancelación, expondrá al pie del documento, clara y concisamente, los motivos legales de su negativa y de ella notificará al interesado, quien firmará la notificación.

Y en 30 L.P.R.A. sec. 1772, se establece que:

"Si éste, dentro del segundo día no recogiere el documento, el registrador lo enviará por el correo más próximo al Tribunal Supremo, quien dentro de diez días decidirá si aprueba o revoca

[3] Consta de los autos que también la Lcda. Santiago, el 8 de noviembre de 1973, le informó al Registrador haber recibido la notificación el 7 de noviembre de 1973; y que no iba a recoger el documento.

la negativa del registrador, y al día siguiente se lo devolverá por correo al registrador para que cumpla la resolución dictada, acompañado de un copia de dicha resolución."

También en la Ley Hipotecaria existe otra disposición en relación a las faltas referentes a la *legalidad de las escrituras* o a la *capacidad de los otorgantes* (30 L.P.R.A. sec. 44) que copiada literalmente lee así:

"Cuando el registrador notare alguna falta referente a la legalidad de las escrituras que se presenten o a la capacidad de los otorgantes, lo comunicará por escrito al presentante o al interesado en la operación registral o al notario que hubiere autorizado el documento, para que lo recojan y subsanen la falta en el término que dure los efectos del asiento de presentación o, cuando menos, dentro de los cinco días después de hecha la notificación. De no subsanarse la falta en el término indicado, el registrador denegará la inscripción si se tratare de defecto insubsanable o hará constar el defecto si fuere subsanable. Si el defecto insubsanable consistiese únicamente en la falta de acompañar algún documento complementario indispensable para la inscripción, anotación o cancelación, el registrador requerirá a las mismas personas y dentro del mismo término indicado, para que acompañen tales documentos complementarios, y, si éstas no lo hicieren, el registrador podrá denegar la inscripción, anotación o cancelación de acuerdo con el procedimiento establecido por ley o suspenderla por medio de nota fundada que extenderá al margen del asiento de presentación, la cual durará sesenta días, y de ella podrá recurrirse para ante el Tribunal Supremo utilizando el remedio establecido en la Ley sobre Recursos contra las Resoluciones de los Registradores de la Propiedad, secs. 1771 et seq. de este título; Disponiéndose, que la notificación al presentante del documento o al interesado en la operación registral o al notario se hará constar al margen del asiento de presentación; y, disponiéndose, finalmente, que cuando se recurra para ante el Tribunal Supremo de Puerto Rico de la suspensión de alguna inscripción, anotación o cancelación, la nota marginal que se extienda continuará produciendo todos sus efectos hasta 30 días después que se tome razón, en el registro de la propiedad correspondiente, de la resolución que recaiga en el recurso interpuesto. Tan pronto el registrador sea notificado de que se ha

interpuesto un recurso ante el Tribunal Supremo de Puerto Rico solicitando la revisión de sus actuaciones, dicho registrador deberá hacer constar en el libro correspondiente e inmediatamente después de la nota marginal de suspensión antes referida, que se ha interpuesto el correspondiente recurso gubernativo, identificándolo por nombre y número, así como que los efectos legales de la mencionada nota marginal de suspensión subsistirán hasta 30 días después de que se tome razón en el registro de la resolución que recaiga en el recurso interpuesto. Ley Hipotecaria, 1893, art. 19; Julio 7, 1923, Núm. 20, p. 213; Junio 23, 1958, Núm. 73, p. 176, ef. Junio 23, 1958."

En el caso *Sucesión Franceschi* v. *Registrador*, 39 D.P.R. 736 (1929) (Texidor), se trataba de una segunda hipoteca sobre cinco fincas a favor del portador o portadores de cinco vales o pagarés suscritos por el dueño de esas fincas, que fue inscrita en el Registro de la Propiedad de Ponce. Posteriormente se inició ante la Corte de Distrito de Ponce un pleito por la Sucesión Franceschi contra el dueño de esas fincas, sobre cobro de pagarés; y la demandante embargó bienes, entre ellos los cinco vales hipotecarios referidos. El Registrador practicó la anotación de dicho embargo; y en cuanto a la hipoteca para garantizar los vales al portador también embargados, aclaró que la anotación se tomaba "sin perjuicio de tercero". Contra esa nota la demandante estableció recurso gubernativo y el Registrador impugnó el mismo alegando que no era ". . . un caso propio de recurso gubernativo, porque no se refiere a la *calificación, denegación* o *declaración* de defecto subsanable. . . ." (⁴) Este Tribunal dispuso de esta alegación previa sobre el procedimiento seguido, diciendo a la pág. 743:

"El recurrido suscita la cuestión de improcedencia del recurso, por no tratarse de una nota denegatoria o de defecto subsanable. No podemos estar de acuerdo con la extremadamente técnica interpretación que de la ley hace el registrador. Si la nota envuelve una *práctica denegación de inscripción,* cabe el recurso

---

(⁴) No hacemos referencia a los fundamentos del recurso en su fondo y a la decisión final de este Tribunal sobre los mismos, porque no tiene pertinencia para la cuestión a que nos estamos refiriendo.

contra ella. La ley ha querido crear un remedio, no una exclusión." (Bastardillas nuestras.)

En *Blanco v. Registrador*, 71 D.P.R. 570, 573 (1950) (Negrón Fernández) se expresó:

"Si bien la nota recurrida lee en su comienzo 'Devuelto el presente documento sin practicar operación alguna . . .', dicha nota constituye realmente una denegatoria de la inscripción solicitada, ya que expresa las razones que para ello tuvo el Registrador. Este ha hecho, en efecto, una calificación del documento, actuación ésta que es revisable mediante recurso gubernativo." (Véanse además: *Autoridad de Fuentes Fluviales v. Registrador*, 71 D.P.R. 847 (1950) (Marrero); *Autoridad de Tierras v. Registrador*, 65 D.P.R. 513, 520–23 (1945) (De Jesús); *Pueblo v. Registrador*, 64 D.P.R. 130–34 (1944) (De Jesús); y *Guánica Centrale v. El Registrador*, 23 D.P.R. 734, 735 (1916) (Aldrey).)

No se trata aquí de un caso en que esté envuelta "alguna falta referente a la legalidad de las escrituras" o a la "capacidad de los otorgantes"; situación cubierta por la Sec. 44 del Título 30 de L.P.R.A., *supra*.

■ El Registrador devolvió la instancia sin practicar operación alguna, y como resolvimos en *Blanco v. Registrador*, supra, dicha actuación constituyó realmente una denegatoria de la inscripción solicitada, ya que expresó las razones que tuvo para así actuar; y este hecho constituye, en efecto, una calificación del documento; y envuelve una práctica denegación de inscripción; siendo su actuación revisable mediante recurso gubernativo. (*Sucn. Franceschi v. Registrador*, supra.) El caso, por tanto, cae bajo lo dispuesto en las Secs. 1771 y 1772 del Título 30 L.P.R.A., *supra*. Bajo esta dos secciones se presentan dos situaciones. La primera es cuando el Registrador deniega o suspende una inscripción, anotación o cancelación (en este caso se trata de una cancelación) en cuyo caso el Registrador expone al pie del documento los motivos legales de su negativa y notifica a la parte interesada; y si ésta recoge el documento, puede traer directamente el

recurso gubernativo para ante este Tribunal. La segunda situación surge cuando, notificada la parte interesada, no recoge el documento dentro del segundo día de ser notificada, en cuyo caso, el Registrador lo enviará por correo al Tribunal Supremo, para que éste resuelva si aprueba o revoca la nota.

En el caso ante nos, como hemos visto, la parte interesada y/o la presentante Lcda. Santiago fue notificada por el Registrador en la misma fecha de la nota y optó por no recoger el documento dentro del segundo día de su notificación.(5)

Ante esta situación, el Registrador, cumpliendo con su deber bajo lo dispuesto en la Sec. 1772, *supra,* lo envió por correo a este Tribunal Supremo.

■ Consideramos pues, que siendo legal la actuación del Registrador; la parte interesada y/o presentante no tenía necesidad de radicar directamente un recurso gubernativo, como lo hizo en este caso, por la duda que alega tener ". . . de si en el caso de devolución de instancia sin practicarse operación alguna procede o no el recurso gubernativo automático que corresponde en los casos de denegatoria de inscripción"; y, ". . . a los fines de proteger la jurisdicción de este Hon. Tribunal. . . ."

Entremos ahora a resolver la cuestión de fondo envuelta en este recurso.

El Registrador consignó como fundamento para su nota, que devolvía la instancia sin practicar operación alguna en el Registro ". . . *por no ser lo solicitado menciones de derechos reales, sino limitaciones y condiciones restrictivas sobre 189 solares. . . .*" (Énfasis nuestro) "relacionadas en la inscripción extensa que resulta ser la inscripción primera de la finca número 18,792 al folio 187 del tomo 658 de Ponce, cuya inscripción se practicó a virtud de la escritura número 3 de 31 de marzo de 1956 ante el notario Erasto Arjona Siaca que

---

(5) Véase escolio 3 a la pág. 299 de esta opinión.

motivó también las inscripciones primeras de los 189 solares segregados para beneficio mutuo."

La posición que asumen los recurrentes esposos Castro Lund-Tormos, según surge de la instancia presentada en el Registro y de su alegato, es que la nota que aparece en la inscripción primera de cada una de las dos fincas de su propiedad de que "Sobre los solares segregados se imponen las limitaciones y restricciones relacionadas en la inscripción extensa citada" no se refiere a cargas existentes por su procedencia, sino a una mención de cargas a que está afecta la finca número 18,792, inscrita en folio y tomo distintos, o sea, al folio 187 del tomo 658 del mismo Registro; que dicha referencia constituye una anotación inoficiosa o a lo sumo una mención inoficiosa también, por improcedente, y de todas maneras caducada, por haberse en ambos casos tomado desde hace más de diez años, o sea, el 31 de octubre de 1956; que se trata de una mención de condiciones personales y aunque lo fuera de derechos reales, ya ha caducado por haberse tomado hacía más de diez años (en el año 1956).

Es cierto que no se refiere a cargas existentes, por su procedencia, ya que las limitaciones y condiciones restrictivas no constaban sobre el resto de la finca, de 34.9491 cuerdas, Núm. 17,847. Pero este resto fue lotificado, dividiéndose en los 189 solares y un área de parques, que se inscribieron en el Registro como solares independientes; y, conforme a lo dispuesto en el Art. 234 de la Ley Hipotecaria, 1893, (30 L.P.R.A. sec. 383) en armonía con el Art. 9 del mismo cuerpo legal (30 L.P.R.A. sec. 34) tratándose de un título que comprendía varios inmuebles radicados en el mismo término municipal, se verificó la inscripción con todas las circunstancias prescritas en la Sec. 34, *supra*, que es la inscripción extensa, [6] hacién-

---

[6] En el presente caso se practicó esta inscripción *extensa* sobre la finca núm. 18,792, folio 187 del tomo 658 de Ponce, en cuya inscripción primera, es donde constan consignadas las limitaciones y restricciones copiadas a la pág. 296 de esta opinión.

dose referencia a dicha inscripción extensa en las inscripciones concisas de los otros solares. Como muy bien sostiene el Sr. Registrador en su alegato, las condiciones o limitaciones restrictivas se consignan una sola vez, en la inscripción extensa, porque de tener que consignarse en todas y cada una de las fincas, ". . . conllevaría una labor clerical [sic] enorme; y mediante la tal única inscripción extensa, la inscripción se realiza una sola vez y se hace referencia a la misma tantas veces como fuera necesaria en las inscripciones concisas. En el caso que nos ocupa, se hubiesen tenido que realizar 189 inscripciones extensas en lugar de la que se hizo en la finca número 18,792."

En su instancia al Registrador los esposos recurrentes no expresan la autoridad legal en que se basan para pedir la referida cancelación; pero de los respectivos alegatos de ambas partes surge que los recurrentes se apoyan en las disposiciones del inciso (a) (⁷) del Art. 388-A de la Ley Hipotecaria, incorporada a dicha Ley en el año 1923, relacionada con la cancelación de asientos (30 L.P.R.A. sec. 703), la cual, en su parte pertinente a este caso, lee así:

"703. *Cancelación de Asientos.*

Los registradores de la propiedad, a instancia de parte, autenticada ante notario procederán a cancelar en el respectivo registro:

(a) (⁸) Cualesquiera menciones de derechos reales que consten en los libros antiguos o modernos del registro, si hubiesen transcurrido más de diez (10) años desde que se verificó la respectiva mención, cuando la parte interesada dentro del plazo de seis (6) meses, a contar desde la fecha en que empiece a regir esta Ley, no hubiese solicitado la inscripción del derecho mencionado, o no hubiese promovido acción judicial en reclamación de su derecho anotando la demanda en el registro."

---

(⁷) Este inciso (a) fue enmendado por la Ley Núm. 12 de 25 de junio de 1924; y toda esta sección fue enmendada por la Ley Núm. 19 de 9 de julio de 1936. (Véase: Historial y Enmiendas, bajo 30 L.P.R.A. sec. 703, a la pág. 449.)

(⁸) Véase escolio (⁷).

Las "menciones" son consagradas por el Art. 29 de la Ley Hipotecaria, que lee así:

"El dominio o cualquier otro derecho real que se mencione expresamente en las inscripciones o anotaciones preventivas, aunque no esté consignado en el registro por medio de una inscripción separada y especial, surtirá efecto contra tercero desde la fecha del asiento de presentación del título respectivo.

Lo dispuesto en el párrafo anterior se entenderá sin perjuicio de la obligación de inscribir especialmente los referidos derechos y de la responsabilidad en que pueda incurrir la persona que en casos determinados deba pedir la inscripción." (Ley Hipotecaria, 1893, art. 29; 30 L.P.R.A. sec. 54.)

En *Miranda* v. *Registrador*, 45 D.P.R. 396 (1933) (Aldrey), se dijo:

"La mención es una mera noticia que hace el registrador de la existencia de un derecho no inscrito. Es el aviso de un derecho pero no la creación de un derecho que ya existe, aunque no esté inscrito, por lo que no está comprendido entre los títulos que pueden ser inscritos según el artículo 2 de la Ley Hipotecaria."

Este artículo se refiere específicamente a menciones *del dominio* o de cualquier otro *derecho real*, los cuales perjudican a tercero, sin perjuicio de la obligación de inscribir especialmente el derecho mencionado. Este limita los efectos de la mención a que perjudica a tercero, de manera que no pueda alegarse ignorancia. (*Miranda*, supra.)

El problema legal envuelto en este caso, a nuestro juicio, es sencillo. Si prevalece la teoría de los recurrentes de: "Que se trata de una mención de condiciones personales y aunque lo fuera de derechos reales, ya ha caducado por haberse tomado [*sic*] más de diez años, o sea, en el año 1956"; [9] debe ordenarse la cancelación. Por el contrario, si prevalece la contención del Sr. Registrador de ". . . no ser lo solicitado menciones de derechos reales, sino limitaciones y condiciones restrictivas sobre 189 solares en la Urbanización La Rambla,

---

[9] Véase pág. 4, último párrafo, alegato recurrentes.

relacionados en la inscripción extensa que resulta ser la inscripción primera de la finca número 18,792, cuya inscripción se practicó a virtud de la escritura número 3 de 31 de marzo de 1956, ante el notario Erasto Arjona Siaca, que motivó también las inscripciones primeras de los 189 solares segregados para beneficio mutuo"; entonces, la nota del Registrador debe ser confirmada.

En el caso de *Baldrich* v. *Registrador*, 77 D.P.R. 739 (1954) (Snyder), los dueños de la urbanización demandada Reparto Baldrich impusieron ciertas restricciones sobre los solares que componían dicha urbanización. Las restricciones aparecían al margen de la inscripción de los solares que componían la urbanización cuando ésta consistía únicamente de la propiedad descrita como finca número 1279. Las restricciones incluían disposiciones relacionadas con la ubicación de los solares, la altura, tipo y valor de las residencias que allí se construirían, parecidas a las impuestas en el presente caso. La primera restricción consistía en que cada uno y todos los solares que componían la finca llamada 'Reparto Baldrich se dedicarían exclusivamente para la construction de residencias, con excepción de cuatro (4) solares que formaban la manzana A, reservada para área comercial de la misma; prohibiendose que en esa área comercial se construyeran edificios para hospitales, clínicas, policlínicas, dispensarios y empresas funerarias o cualquier otro negocio de igual o similar naturaleza; y los *solares números 201 y 202 de la manzana K* fueron reservados para *la construcción de un* "*Club House.*" [10]

Los dueños de los referidos dos solares 201 y 202 radicaron ante el Registrador de la Propiedad de Río Piedras un documento en el cual solicitaron que cancelara, mediante nota al margen de la inscripción de la finca número 1279, la mención que aparecía en dicha inscripción de que las parcelas números 201 y 202 habían sido reservadas para la construcción en ellos

---

[10] Véase escolio (1) en dicho caso de *Baldrich*, supra.

de una "Casa Club". Fundamentaron su petición en que dicha mención no implicaba derecho real de clase alguna, de los taxativamente enumerados en el Art. 2 de la Ley Hipotecaria, a saber: dominio, usufructo, uso, habitación, enfiteusis, hipoteca, censo y servidumbre; que la referida reserva a lo sumo implica una simple prerrogativa de carácter personal; que los derechos que no sean de la clase de los reales, aunque aparezcan mencionados en los Registros, no surten efectos hipotecarios y deben considerarse como no inscritos conforme a la doctrina hipotecaria y los casos de *Rullán* v. *Registrador*, 67 D.P.R. 702 (1947) (Marrero) y *López* v. *Registrador*, 67 D.P.R. 962 (1947) (Snyder); y que en los planos de dicho Registro, aprobados por la Junta de Planificación, inscritos en el Registro, no aparecía que dichos solares 201 y 202 hubieran sido dedicados, reservados o designados para construir en ellos un *Club House* o edificio de clase determinada.

El Registrador denegó la solicitud: (1) porque dicha cancelación podría perjudicar derechos de otras personas que adquirieron y poseían solares en la urbanización con el conocimiento de que en dichos solares 201 y 202 se construiría un *Club House;* y (2) porque para los efectos del Registro, por lo menos debería obtenerse la aprobación de la Junta de Planificación para esa cancelación.

Este Tribunal sostuvo la nota denegatoria del Registrador, por el primer fundamento consignado en ella, y que mencionamos arriba. Sostuvimos que la inscripción en el Registro de un derecho puramente personal puede cancelarse a solicitud del dueño del inmueble que resulte afectado (*López* v. *Registrador*, supra *Rullán* v. *Registrador*, supra; Art. 28 del Reglamento para la Ejecución de la Ley Hipotecaria; y tratadistas allí citados); pero que no podíamos concurrir con los recurrentes en que la reserva de los solares 201 y 202 para un *Club House* no es un derecho real a favor de los demás solares que componen el Reparto Baldrich; que esas restricciones sobre los solares que se crearon para componer la

urbanización Reparto Baldrich tenían el loable objetivo de proveer un plan de áreas residenciales, comerciales y recreativas en la urbanización y que tales restricciones, en cuanto a lo que surgía del récord, eran permisibles como cuestión de derecho y su inscripción procedía en el Registro *como derechos reales* a favor de los predios dominantes y en contra de los sirvientes. Sugerimos que si la disposición de que los solares números 201 y 202 deberían usarse para un *Club House* fuera a ser modificada, debería hacerse mediante un método que no fuera una petición ex parte, de los dueños de dichos solares solicitando su cancelación; aunque expresamos que la cuestión de si los recurrentes podían obtener la cancelación de la restricción en cuanto al uso de los dos solares mediante el consentimiento de los demás dueños de los otros solares, o por algún procedimiento plenario, no estaba ante nos y no lo comentábamos.

Expresamos en dicho caso de *Baldrich*, supra:

"Pero el factor determinante para nuestros fines es que al margen de la inscripción de una escritura agrupando cierto número de solares para formar una urbanización denominada Reparto Baldrich se inscribió una serie de restricciones sobre todos los solares para su beneficio mutuo. Estas restricciones incluían la 'reserva' de ciertos solares para usos comerciales que no estuviesen taxativamente prohibidos, y la 'reserva' de los solares números 201 y 202 para un club house. Los solares restantes estaban restringidos a uso residencial. Desde el punto de vista de los dueños de estos últimos—que pudieran desear facilidades comerciales y recreativas en la urbanización—las restricciones sobre los solares de la manzana A y sobre los solares núms. 201 y 202 para fines comerciales y un club house, respectivamente, serían beneficiosas para sus solares residenciales. De ahí que, desde su punto de vista, las restricciones de uso tanto en cuanto a los solares comerciales como en cuanto a los solares núms. 201 y 202 son derechos reales—siendo sus solares los predios dominantes y los solares comerciales y para el club house, respectivamente, los sirvientes, que están debidamente inscritos en el registro de la propiedad."

Y continuamos diciendo:

"Salvo un derecho hipotecario, la inscripción es sólo declarativa y no es fuente de derechos. I Roca Sastre, supra, págs. 150-1, 153; III-1 Enneccerus, Kipp y Wolff, Tratado de Derecho Civil, 210; Sentencia del Tribunal Supremo de España de 21 de febrero de 1947. Pero no podemos convenir con los recurrentes que este principio nos obliga a revocar la nota del Registrador en este caso. Por el contrario, como hemos visto, la certificación del Registrador en relación con la inscripción al margen de la finca núm. 1279 dice que las restricciones sobre los solares que componen el Reparto Baldrich '. . . resultan de las escrituras([11]) sobre imposición de condiciones restrictivas y actas aclaratorias. . .' otorgadas y presentadas para inscripción. No es éste por lo tanto un caso *en que el Registrador sostiene que el Registro es la fuente del derecho real aquí envuelto.* Más bien los dueños de la parcela—que se convirtió en el Reparto Baldrich y de la cual se segregaron los diferentes solares del mismo—*crearon mediante escritura restricciones, que fueron luego inscritas,* en cuanto al uso de los solares núms. 201 y 202 como el predio sirviente para beneficio de los solares restantes en el Reparto Baldrich como el predio dominante." (Bastardillas nuestras.) ([11a])

Igual situación surge en el caso de autos. De la propia nota del Registrador aparece que éste considera que no se trata de menciones de derechos reales, sino de limitaciones y condiciones restrictivas sobre los 189 solares en la urbanización La Rambla relacionados en la inscripción extensa ". . . que resulta ser la inscripción primera de la finca núm. 18,792 al folio 187 del tomo 658 de Ponce, cuya inscripción se practicó *a virtud de la escritura número 3 de 31 de marzo de 1956, ante el notario Erasto Arjona Siaca,* que motivó también las

---

([11]) Las restricciones aparecían al margen de la inscripción de los solares que componían la urbanización cuando ésta consistía únicamente de la propiedad descrita como la finca núm. 1279; y la certificación del Registro indicaba que dicha *inscripción marginal* terminaba de la siguiente manera: "Así resulta de la escritura sobre imposición de condiciones restrictivas y actas aclaratorias núms. 15, 18 y 29 de fechas 20 de febrero, 4 de marzo y 16 de abril de este año, otorgadas en Río Piedras, ante el notario Emilio Rodríguez. . . ."

([11a]) *Baldrich* v. *Registrador*, supra, págs. 744-746.

inscripciones primeras de los 189 solares segregados para beneficio mutuo." (Bastardillas nuestras.) También en la certificación del Registro que consta en autos, aparece que en dicha inscripción primera de dicha finca Núm. 18,792 se hizo constar igual circunstancia de que fue por la escritura Núm. 3 ante el notario Arjona Siaca, *supra*, aclarada en cuanto a los solares descritos con los números 343 y 459 por la escritura Núm. 108 otorgada en Ponce el 10 de octubre de 1956 ante el notario Pedro E. Muñiz Ramos, que la Ponce Builders Corporation segregó los 189 solares e impuso las limitaciones y condiciones restrictivas envueltas en este recurso, que se inscribieron e hicieron constar sobre el solar segregado Núm. 18,792, que motivó la inscripción extensa mencionada antes, y sobre los dos solares objeto del recurso. Igual que el caso de *Baldrich*, supra, no es el presente pues, un caso en que el Registro es la fuente del derecho real aquí envuelto. ([12]) Fue la dueña de la finca que se convirtió en la urbanización La Rambla y de la cual se segregaron los 189 solares, quien creó mediante escrituras, las restricciones que luego fueron inscritas sobre todos dichos solares, incluyendo los dos que adquieron los recurrentes.

Finalmente, en *Colón* v. *San Patricio Corporation*, 81 D.P.R. 242 (1959) (Saldaña), resolvimos:

"Bastará añadir, para terminar con este análisis de nuestra jurisprudencia, que por analogía con la servidumbre predial del derecho civil usamos los términos de 'predios sirvientes' y 'predios dominantes' en *Baldrich* v. *Registrador*, 77 D.P.R. 739 (1954), al decidir que las servidumbres en equidad *crean derechos reales* inscribibles en el Registro de la Propiedad. Por eso la cancelación de su mención o inscripción no se puede operar en el registro en virtud de una petición ex parte, sin que den su expreso consentimiento las personas a ser perjudicadas por dicha cancelación. De ahí no cabe inferir que las restricciones de urbanización crean verdaderas servidumbres prediales. De

---

([12]) Véase al final de la pág. 745 y comienzo de la pág. 746, del caso de *Baldrich*, supra.

acuerdo con lo dispuesto en el art. 2 de la Ley Hipotecaria (30 L.P.R.A. sec. 2) y en el art. 27 del Reglamento Hipotecario (30 L.P.R.A. sec. 858), son inscribibles todos los derechos reales inmobiliarios, sin que éstos estén limitados a los que define el Código Civil. Es decir, en nuestro derecho positivo prevalece la teoría del *numerus apertus*, que admite la posibilidad de crear derechos reales fuera de los previstos y organizados por el Código Civil. Se deja a la jurisprudencia y a la doctrina la cuestión de precisar el carácter real de los distintos derechos subjetivos, según las conveniencias económicas de los contratantes. Como la servidumbre en equidad tiene de ordinario el carácter y los efectos de un derecho real, a los fines del Registro no hay inconveniente en considerarla como una variante o modalidad de las servidumbres explícitamente reguladas por el Código Civil. Por esa razón es que tiene acceso al Registro el derecho de servidumbre en equidad, a pesar de que dicha figura jurídica ha sido acuñada por nuestra jurisprudencia. Precisamente en el caso de *Baldrich* se trataba de un gravamen que el dueño de los terrenos a ser urbanizados había impuesto por sí solo sobre un fundo propio. La inscribilidad no podía justificarse a base de que se había constituído una servidumbre predial ortodoxa. Cf. 15 Rev. Jur. de la U.P.R. 195, 200–201 (1955)." (Bastardillas nuestras.)

■ Teniendo la inscripción que se practicó en este caso las restricciones y limitaciones que se impusieron sobre los 189 solares de la urbanización La Rambla el carácter y los efectos de un derecho real, procede confirmar la nota recurrida. ([13])

---

([13]) Los recurrentes hacen mención a un pleito pendiente relacionado con la cuestión aquí planteada. Conforme con lo resuelto en *Caballero* v. *Registrador*, 42 D.P.R. 635 (1931), lo dispuesto en 30 L.P.R.A. sec. 1779 y el caso de *Baldrich*, supra, no vamos a hacer referencia al mismo, por no estar la cuestión ante nos. No obstante, véase el caso de *Colón* v. *San Patricio Corporation*, supra.